240 F.3d 1019 (Fed. Cir. 2001)
 SPENCER WILLIAMS, AUBREY E. ROBINSON, JR., C. CLYDE ATKINS, LOUIS C. BECHTLE, SANDRA S. BECKWITH, LUCIUS D. BUNTON, III, WILLIAM M. BYRNE, JR., ADRIAN G. DUPLANTIER, IRVING HILL, MORRIS E. LASKER, THOMAS C. PLATT, JR., JOHN W. REYNOLDS, WALTER H. RICE, MARVIN H. SHOOB, JOSEPH L. TAURO, LAUGHLIN E. WATERS, LEE R. WEST, CHARLES WIGGINS AND HENRY R. WILHOIT, JR., PLAINTIFFS-APPELLEES,
v.
UNITED STATES, DEFENDANT-APPELLANT.
 No. 99-1572, 00-1254,-1255
 United States Court of Appeals for the Federal Circuit
 February 16, 2001
 
 Appealed from: United States District Court for the District of Columbia
 Senior Judge John Garrett Penn[Copyrighted Material Omitted][Copyrighted Material Omitted]
 Kevin M. Forde, Kevin M. Forde, Ltd., of Chicago, Illinois, argued for plaintiffs-apellees. With him on the brief were Janice R. Forde, and Kevin R. Malloy. Of counsel on the brief were Richard J. Prendergast and Deirdre N. Close, Richard J. Prendergast, Ltd., of Chicago; and John S. Guttmann, Jr., Beveridge & Diamond, of Washington, DC.
 Douglas N. Letter, Attorney, Appellate Staff, Civil Division, Department of Justice, of Washington, Dc, argued for defendant- appellant.
 Richard William Austin, Pretzel & Stouffer, Chartered, of Chicago, Illinois, for amicus curiae National, State, and Local Bar Associations.
 Before Clevenger, Circuit Judge, Plager, Senior Circuit Judge,* and Gajarsa, Circuit Judge.
 Clevenger, Circuit Judge.
 
 
 1
 Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting Opinion filed by Senior Circuit Judge PLAGER.
 
 
 2
 The United States appeals from the decision of the United States District Court for the District of Columbia holding that Plaintiffs Spencer Williams, et al. ("the Judges") are entitled to back pay and future cost-of-living pay increases under the Ethics Reform Act of 1989. See Williams v. United States, 48 F. Supp. 2d. 52, 65 (1999). In the four years involved in this case, Congress enacted legislation providing cost-of-living pay increases for federal employees, including federal judges, with the increases payable the following January 1. But in each of those years, Congress also enacted specific legislation, before the end of the year, which denied such pay increases to federal judges, while allowing the increase to be paid to other federal employees. Ruling in favor of Plaintiffs, the district court held that the statutes which denied the pay increases to federal judges violate section 1 of Article III of the United States Constitution, a provision that bars Congress from diminishing the compensation of federal judges. Because clear and unavoidable precedent from the Supreme Court permits Congress to block planned increases in the compensation of federal judges, so long as the blocking statutes are enacted before the planned increases become due and payable to federal judges, the district court erred. We reverse the judgment of the district court, and remand the case with instructions to enter judgment in favor of the United States.
 
 I.
 
 3
 In 1989, the Ethics Reform Act, Pub. L. No. 101-194, 103 Stat. 1716 ("the 1989 Act"), put in place a system by which federal judges, under certain circumstances, were to obtain, beginning in 1991, yearly cost- of-living pay increases ("COLAs"). The COLA provisions of the 1989 Act were but one part of a host of important reforms. Key reforms of the 1989 Act included extension of post-employment "revolving door" restrictions to the legislative and executive branches, a ban on receipt of honoraria by all federal employees (except members of the Senate), limitation on the outside income for employees in all three branches to avoid any appearance of unethical behavior, increased financial disclosure by federal employees, limitations on gifts and travel, creation of conflict-of-interest rules for legislative branch staff, and, of course, important adjustments to compensation for all three branches. Federal judges received significant increases in base pay, to make up for the adverse effect of inflation on previous levels of base pay and to catch up for COLAs previously withheld from the federal judges by Congress. See Statement by President of the United States Upon Signing of H.R. 3660, 1989 U.S.C.C.A.N. 1225 (synopsizing key features of the 1989 Act).
 
 
 4
 Pursuant to the 1989 Act, once a determination was made by Congress in a given year that a COLA would be paid to federal employees on the General Schedule, a COLA became payable to federal judges. See 28 U.S.C. §§ 461 (1994) (adjusting judicial pay "[e]ffective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5303 of title 5 in the rates of pay under the General Schedule"). The increases would take effect--that is, they would be payable--starting on the first day of the following calendar year. See id.; 5 U.S.C. §§ 5303(a) (1994) (increases are "[e]ffective as of the first day of the first applicable pay period beginning on or after January 1 of each calendar year"). This procedure began in 1991. See Pub. L. No. 101- 194, §§ 704(b), 103 Stat. 1716, 1769. In January of 1991, 1992 and 1993, federal judges received COLAs. For 1994, Congress awarded no COLA to the General Schedule, and consequently none became payable to federal judges on January 1 of that year.
 
 
 5
 For 1995, 1996, 1997, and 1999, such automatic COLA pay increases were set to go into effect for General Schedule employees and federal judges, as of the first day of the calendar year. But for those years, to the disappointment of the federal judges, the Congress passed separate laws, and the President signed them into effect, that expressly barred the payment of the COLAs to federal judges. See Pub. L. No. 103- 329, §§ 630(a)(2), 108 Stat. 2382, 2424 (1994), Pub. L. No. 104-52, §§ 633, 109 Stat. 468, 507 (1995), Pub. L. No. 104-208, §§ 637, 110 Stat. 3009, 3009-364 (1996), Pub. L. No. 105-277, §§ 621, 112 Stat. 2681, 2681- 518 (1998). Each of those "blocking" acts became law before the January 1 effective date of the COLA pay increases.
 
 
 6
 The Judges responded by bringing this class action lawsuit in the United States District Court for the District of Columbia. Their suit alleges that the deprivation of the pay increases, as a result of Congress' blocking acts, violates Article III of the United States Constitution. Article III, of course, protects judicial compensation: "The Judges . . . shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const., art. III, §§ 1. The history of this provision, and its significance to the functioning of an independent federal judiciary, has been recounted eloquently and at length elsewhere, and need not be repeated here. See, e.g., Evans v. Gore, 253 U.S. 245, 249- 54 (1920); United States v. Will, 449 U.S. 200, 217-21 (1980).
 
 
 7
 The theory of the Judges' suit is that Congress "diminished" judicial compensation by specifically denying federal judges the COLA raises that would have been paid under the statutory scheme of the 1989 Act, but for the acts of Congress that nullified the otherwise automatic increases. The asserted logic of this theory is that the judicial COLA increases became vested--that is, the Judges became entitled to them for later dates of receipt--before the dates that Congress acted to block them. The Judges thus allege that the laws depriving them of the COLAs are void as unconstitutional under Article III, section 1, and that they are therefore entitled to the COLAs, in the form of back pay and a current increase in salary. The Judges also request a declaration that the COLA provisions of the 1989 Act must be followed in future years.
 
 
 8
 The district court, on cross-motions for summary judgment, held in favor of the Judges, ruling that "[t]he Ethics Reform Act granted federal judges a COLA . . . adjustment, effective at the time of the enactment of the Act in 1989." See Williams, 48 F. Supp. 2d at 59. Because it considered the COLAs to have become "part of the compensation due and payable to Article III judges," id. at 59 (citation omitted), on the date that the 1989 Act became law, the district court granted monetary judgment in favor of the Judges and ordered the government to award COLAs to federal judges in the future whenever COLAs are awarded to the General Schedule. See id. at 65. Thus, under the district court's order, whenever Congress in the future awards a COLA to the General Schedule, Article III requires that a COLA be paid to federal judges.
 
 
 9
 The government then brought these appeals,[1] over which we have jurisdiction pursuant to 28 U.S.C. §§ 1295(a)(2) (1994).
 
 II.
 
 10
 Before turning to the merits of the case, we address the preliminary issues of jurisdiction over this appeal and our potential disqualification.
 
 A.
 
 11
 The Judges invoked the jurisdiction of the district court under 28 U.S.C. §§ 1346(a)(2) (1994). That provision, commonly known as the Little Tucker Act, vests the district court with jurisdiction over a "claim against the United States, not exceeding $10,000 in amount." In its brief to this court, the government suggests that the individual plaintiff judges would each receive in excess of $10,000 were we to affirm the judgment of the district court. At oral argument, the government withdrew its jurisdictional challenge at least as to the Judges' prayer for relief for the 1995 year, since each individual judge would receive less than $10,000 for the unpaid COLA for that year. We agree that the district court possessed Little Tucker Act jurisdiction at least to that extent, if not to the entirety of the complaint. See Hatter v. United States, 953 F.2d 626, 628-29 (Fed. Cir. 1992). Because sufficient jurisdiction is established in the district court to authorize its ruling as to 1995, and because we hold that the Judges' case fails, we need not decide the full extent of the district court's jurisdiction over the Judges' complaint.[2]
 
 B.
 
 12
 We now turn to the question of our potential disqualification. Under 28 U.S.C. §§ 455(b)(4) (1994), "[a]ny justice, judge, or magistrate of the United States" is disqualified if he or she "has a financial interest in the subject matter in controversy." Given that the remedies ordered by the district court would both result in damages awards to federal judges serving during the relevant years, as well as require future COLAs to be granted according to the 1989 Act, it appears that every Article III judge has a potentially-disqualifying financial interest in the outcome of this case. See, e.g., Will, 449 U.S. 200, 212 (1980) (noting, in a factually similar case, that "all Article III judges have an interest in the outcome").
 
 
 13
 Section 455, however, does not alter the centuries-old "Rule of Necessity," which allows--and even seems to require--federal judges to hear and decide matters in which they have a financial interest, if necessary to the exercise of the court's jurisdiction. See Will, 449 U.S. at 214 ("The true rule unquestionably is that wherever it becomes necessary for a judge to sit even when he has an interest--where no provision is made for calling another in, or where no one else can take his place--it is his duty to hear and decide, however disagreeable it may be." (quoting Philadelphia v. Fox, 64 Pa. 169, 185 (1870)). Accordingly, the Supreme Court has held that where Article III judicial compensation is at issue, judges have an "absolute duty . . . to hear and decide cases within their jurisdiction." Will, 449 U.S. at 215. We thus must accept the obligation to hear this appeal, pursuant to the Rule of Necessity, notwithstanding our personal interest in the outcome.
 
 III.
 
 14
 In the district court, the government argued, as it does again here, that the courts have no occasion to worry over the constitutional implications of the refusal by Congress to allow the otherwise automatic COLAs to take effect in 1995, 1996, 1997 and 1999, as stated in the 1989 Act. This is so, according to the government, because of the requirements of Section 140 of a Joint Resolution making continuing appropriations for fiscal year 1982. See Pub. L. No. 97-92, §§ 140, 95 Stat. 1183, 1200 (1982). Section 140 states in relevant part:
 
 
 15
 Notwithstanding any other provision of law or of this joint resolution, none of the funds appropriated by this joint resolution or by any other Act shall be obligated or expended to increase, after the date of enactment of this resolution, any salary of any Federal judge or Justice of the Supreme Court, except as may be specifically authorized by Act of Congress hereafter enacted . . .
 
 
 16
 The government argues that in the years at issue here, the COLAs sought by the judges were not "specifically authorized" by Congress, and thus Section 140 prevents their payment. We disagree.
 
 
 17
 First, we note that by its own terms, the relevant provisions of Public Law 97-92, which contained Section 140, expired as of September 30, 1982. See Pub. L. No. 97-161, 96 Stat. 22 (1982) (extending life of provisions from March 31, 1982 to September 30, 1982); Pub. L. No. 97- 92, §§ 102(c), 95 Stat. 1183 (1981). The government, however, notes that in the years 1991, 1992, 1993, and 1998, when federal judges were granted COLAs under the provisions of the 1989 Act, Congress passed laws stating that "[p]ursuant to section 140 of Public Law 97-92, Justices and judges of the United States are authorized during [1991, 1992, 1993] to receive a salary adjustment in accordance with 28 U.S.C. section 461." Pub. L. No. 101-520, §§ 321, 104 Stat. 2254, 2285 (1990); Pub. L. No. 102-140, 105 Stat. 782, 810 (1991); Pub. L. No. 102-395, 106 Stat. 1828, 1959 (1992). Thus, the government argues that Congress clearly intended Section 140 to have a life beyond that of its stated expiration in 1982. We find this response unpersuasive. The recent congressional references to Section 140 are insufficient to convey a congressional intent to override the unmistakable language of Public Law 97-92 (as amended by Public Law 97-161) terminating the effect of Section 140 in 1982. Indeed, the enactment of Public Law 97-161 itself supports this view: Congress clearly understood that Section 140 (among other provisions, of course) was scheduled for expiration on March 31, 1982, and duly extended the life of that provision for six months, to September 30, 1982. See Pub. L. No. 97-161, 96 Stat. 22 (Mar. 31, 1982). If Congress had intended to further extend the effective life of Section 140--that is, beyond the already-extended termination date of September 30, 1982--it would have done so clearly and deliberately. Instead, the recent references to Section 140 appear to be a congressional response to the views of the Comptroller General of the United States, who in a series of letters and decisions since 1982, has taken the position that Section 140 is permanent legislation. See Federal Judges V, 1996 WL 97482 (Mar. 6, 1996) (unpublished); Federal Judges IV, 65 Comp. Gen. 352 (Feb. 27, 1986); Federal Judges III, 63 Comp. Gen. 141 (Dec. 28, 1983); Federal Judges II, 62 Comp. Gen. 358 (May 6, 1983); Federal Judges I, 62 Comp. Gen. 54 (Nov. 23, 1982); Letter from Comptroller General of the United States to The Honorable Jamie L. Whitten, October 1, 1982. We view these citations to Section 140 as pragmatic steps taken by Congress to set aside any possible legal arguments (based on Section 140) that the recent COLAs and other pay adjustments are rendered void by Section 140. Where Congress enacts legislation with a clear and express termination date, we need more than the views of the Comptroller General to rewrite the plain language of a statute. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction, our analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well.") (internal quotations and citations omitted). Congress failed to mark Section 140 with the indicia of permanence. The effectiveness of Section 140 therefore ended on September 30, 1982.
 
 
 18
 Second, even if Section 140 did not expire as of September 30, 1982, the 1989 Act falls well within the specific exception in that statute for an "Act of Congress hereafter enacted." That is, Section 140, by its own terms, yields to inconsistent provisions of later- enacted laws. Here, clearly, the 1989 Act was enacted after Section 140, and the 1989 Act, by providing a specific process by which federal judges are to become eligible for COLAs, is inconsistent with the general ban on pay increases established by Section 140. Thus, should there be any disagreement that Section 140 died according to its terms, the 1989 Act controls, rendering the government's reliance on Section 140 moot. In sum, we are wholly unpersuaded by the government's argument that Section 140 is dispositive of the issues presented here. Because Section 140 terminated in 1982 and was clearly superseded by the provisions of the 1989 Act, we must address the question of whether the acts of Congress that repealed the planned COLAs worked violations of Article III.
 
 
 19
 While we think enough has been said above to dispose of the Section 140 issue, we do agree with and adopt the additional points made by the dissent in support of our unanimous conclusion that Section 140 is inapplicable.
 
 IV.
 
 20
 In United States v. Will, supra, the Supreme Court considered the Article III implications of negating a judicial pay-raise scheme strikingly similar to the one we address today. The interlocking statutory system considered in Will subjected judicial salaries to the same annual adjustment process made for federal employees under the General Schedule ("GS") pursuant to the Federal Pay Comparability Act of 1970. See id. at 203-04. Under the Comparability Act, the President was required to designate an agent each year to submit recommendations deemed appropriate to bring federal employees' salaries in line with prevailing rates in the private sector. See id. at 203. The President also retained the authority to submit his own recommendation. See id. at 204. Which recommendation controlled depended upon Congress: if one House of Congress adopted a resolution expressing disapproval of the President's adjustments within 30 days of their submission, then the agent's recommendation would control. See id. Judicial salaries were automatically increased, either by the amount specified by the agent or by the amount recommended by the President. See id. at 203. The effective date of the pay increases was to be the start of the first pay period beginning on or after the beginning of the federal fiscal year on October 1. See id. at 204. Thus, the statutory pay adjustment scheme in Will provided for "automatic" pay raises to the GS and to federal judges: once the amount of the COLA was fixed according to the Comparability Act processes, GS employees and federal judges, pursuant to statute, would receive COLA pay increases, beginning on October 1. See id. Pursuant to the Comparability Act, in every ensuing year GS employees and federal judges were to receive COLAs. No further legislative act was required to guarantee receipt of the COLA. Only the amount of the COLA might have been affected by a legislative resolution. Federal judges were linked into the Comparability Act, and thus assured annual COLAs, by the terms of the Executive Salary Cost-of-Living Adjustment Act of 1975, Pub. L. 94-82, 89 Stat. 419. The statute, in section 205, expressly provided that federal judges would receive the annual COLA adjustment given to the General Schedule. The Senate Report on that statute, S. Rep. No. 94-333 (July 29, 1975) is replete with references to the need for increase in judicial compensation, comparing the level of such compensation to the greater incomes of private attorneys, id. at 6, and comparing the compensation of federal judges unfavorably to that of state court judges. Id. The report also noted that federal judges were leaving the bench to return to more lucrative private life, id. at 8, and cited the "critical need" to adjust judicial salaries. Id. at 13.
 
 
 21
 The COLA statute considered in Will guaranteed that federal judges would receive--every year--a COLA pay increase. The statute authorizing the COLAs for federal judges contained no mechanism whereby Congress could prevent the automatic COLAs from taking effect every year. Nonetheless, in four particular years at issue in Will, Congress passed specific legislation that barred payment of the COLAs to federal judges. The question before the Court in Will was whether Congress has the constitutional authority to block automatic COLAs that would increase judicial compensation.
 
 
 22
 The question for us is no different than the question which the Supreme Court posed for itself to initiate the deliberative process in Will that led to the constitutional rule of vesting that the Court adopted. The question bears repeating here, to remind us of the necessary focus of our attention:
 
 
 23
 [W]hen, if ever, does the Compensation Clause prohibit the Congress from repealing salary increases that otherwise take effect automatically pursuant to a formula previously enacted? We must decide when a salary increase authorized under such a formula "vests" -- i.e., becomes irreversible under the Compensation Clause. Is the protection of the Clause first invoked when the formula is enacted or when increases take effect?
 
 
 24
 Id. at 221 (emphasis in original).
 
 
 25
 In Will, the Supreme Court considered four different years in which the statutory system sought to provide COLAS to federal judges. There can be no doubt that the statutory scheme considered in Will was designed by Congress to provide automatic annual COLA pay increases to the GS and to federal judges. In the first year ("Year 1"), the rate of increase under the Comparability Act was set at 4.8 percent. See id. at 205-06. Under the terms of the Comparability Act, no legislative act was necessary to put the COLA pay increase into effect. Instead the requisite salaries were simply adjusted by Executive Order No. 11941, signed by the President on October 1, 1976. Also on October 1, the first day of the new fiscal year, and the first day of the relevant pay period, the President signed a measure (hereinafter referred to as a "blocking statute"), which purported to block the pay increase for federal judges. See id. (quoting Pub. L. No. 94-440, Title II, 90 Stat. 1439 (1977)). The Supreme Court held that this enactment was in violation of Article III, because "the 4.8% increase under the Adjustment Act already had taken effect, since it was operative with the start of the month--and the new fiscal year--at the beginning of the day." Id. at 224-25. Therefore, the attempt to block the pay increase to judges was in fact a repeal of the salary increase already in force as of the beginning of the day, and thus "diminished" the salary of federal judges. Id. at 225.
 
 
 26
 In the second year ("Year 2") considered by the Court in Will, the specified rate of pay increase was 7.1 percent. See id. at 226. This salary increase became effective by virtue of Executive Order No. 12010, issued by the President on September 28, 1977. In this year, however, the President had previously signed a blocking statute on July 11, well prior to the October 1 effective date of the pay increases. See id. at 206. The blocking statute thus prevented federal judges from getting their COLA, even though the statutory scheme provided that the COLA would automatically take effect the following October 1. The Court held that the rescission by Congress of the planned "automatic" pay increase for judges was not a violation of Article III, section 1. See id. at 229. The Court reasoned that for purposes of Article III, the pay increase to judges had not yet "vested" when the President and Congress blocked it by statute, stating: "a salary increase `vests' for the purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges." Id. Because the planned pay increase did not actually take effect until October 1, the President and Congress were free to alter or prevent it until that date. See id. ("[W]e hold that the Compensation Clause did not prohibit Congress from repealing the planned but not yet effective cost-of-living adjustment of October 1, 1977, when it did so before October 1, the time it first was scheduled to become part of judges' compensation.").
 
 
 27
 The third year ("Year 3") was similar to Year 2. The President approved the blocking statute on September 30, 1978, just in time to prohibit the automatic COLA from becoming constitutionally protected judicial compensation. See id. Thus, while the GS salaries were increased pursuant to an Executive Order by 5.5 percent, the judges were deprived of their increase. See id. at 207. Because the blocking statute took effect before October 1, the Court ruled that no constitutional violation had occurred. See id. at 229.
 
 
 28
 The fourth year (`Year 4") was a reprise of Year 1. The rate of salary increase pursuant to Executive Order was 7 percent, which was a reduced figure submitted by the President (the President's agent had suggested a 10.41 percent increase). See id. at 208. Year 4, according to the Supreme Court's statement of the facts in Will, was the only year in which the President overrode the agent's suggested COLA. The blocking statute, however, was not signed by the President until October 12, well after the October 1 effective date of the pay increases. See id. Accordingly, the Court held that the blocking statute in Year 4 was an unconstitutional diminishment of judicial pay. See id. at 230.
 
 
 29
 In sum, the Supreme Court in Will unanimously created a clear and simple rule for determining whether the repeal of a statutorily-mandated judicial pay increase runs afoul of Article III. The analysis turns on the timing of the repeal action rather than the "automatic" or "discretionary" nature of the planned pay raise. Pursuant to Will, if Congress and the President wish to prevent a planned increase in judicial compensation, they must do so before the date that the pay increase becomes actually "due and payable" as part of the judges' compensation package. See id. at 229. Legislative blocking action taken after a pay increase has taken effect unconstitutionally diminishes judicial pay.
 
 
 30
 Why, one may ask, did the Supreme Court graft this vesting rule onto Article III? The Supreme Court gave us the answer in Will:To say that the Congress could not alter a method of calculating salaries before it was executed [i.e. became due and payable in the manner specified by Congress] would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Congress.
 
 
 31
 Id. at 228 (emphasis added). At the end of the sentence just quoted, the Supreme Court appended footnote 33, stating: "Indeed, it would be particularly ironic if we were to bind Congress to an indexing scheme for salaries when the Framers themselves rejected an indexing proposal." Congress, of course, alone has the constitutional authority to set the compensation of federal judges. In Will, the Supreme Court accommodated the dual commands of Article III--that while Congress sets judicial compensation, once vested it cannot diminish that compensation. The vesting rule of Will marks the point in time at which a specific congressional decision to increase judicial compensation cannot be reversed.
 
 V.
 
 32
 With this understanding of the legal framework established by the Court in Will, by which we of course are strictly bound, we now turn to the circumstances of this case.
 
 A.
 
 33
 Adjustments to judicial salaries are authorized by 28 U.S.C. §§ 461 (Supp. 2000), which states:
 
 
 34
 (a)
 
 
 35
 (1) Subject to paragraph (2), effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5303 of title 5 in the rates of pay under the General Schedule (except as provided in subsection (b)), each salary rate which is subject to adjustment under this section shall be adjusted by an amount, rounded to the nearest multiple of $100 (or if midway between multiples of $100, to the next higher multiple of $100) equal to the percentage of such salary rate which corresponds to the most recent percentage change in the ECI (relative to the date described in the next sentence), as determined under section 704(a)(1) of the Ethics Reform Act of 1989. The appropriate date under this sentence is the first day of the fiscal year in which such adjustment in the rates of pay under the General Schedule takes effect.
 
 
 36
 (2) In no event shall the percentage adjustment taking effect under paragraph (1) in any calendar year (before rounding), in any salary rate, exceed the percentage adjustment taking effect in such calendar year under section 5303 of title 5 in the rates of pay under the General Schedule.
 
 
 37
 (b) Subsection (a) shall not apply to the extent it would reduce the salary of any individual whose compensation may not, under section 1 of article III of the Constitution of the United States, be diminished during such individual's continuance in office.
 
 
 38
 Section 461 thus provides two important guideposts. First, of course, it links judicial pay raises with adjustments to GS salaries. But even more importantly, it explicitly establishes the date that such raises take effect: any pay increases are to be "effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5303 of title 5 in the rates of pay under the General Schedule." 28 U.S.C. §§ 461(a)(1). Section 5303 of Title 5 provides that GS salary adjustments take effect as of "the first day of the first applicable pay period beginning on or after January 1 of [the] calendar year." Thus, section 461, incorporating the relevant language from section 5303, provides that any judicial pay increases will take effect as of the first applicable pay period beginning after January 1. Under the Supreme Court's decision in Will, this date is the critical date: before this date, Congress and the President may act to block planned pay increases, see 449 U.S. at 226-29 (discussing Years 2 and 3); after this date, a statute repealing a judicial pay increase is unconstitutional, see 449 U.S. at 224-26, 229-30 (discussing Years 1 and 4).
 
 
 39
 In this case, there is no dispute that in the years at issue (1995, 1996, 1997, and 1999), GS salaries were increased. There is also no dispute that, given the GS salary adjustments and the framework established by the 1989 Act, judicial salaries should also have been increased, effective as of the first applicable pay period on or after January 1 of the next calendar year. Indeed, the whole of the 1989 Act, and its legislative history, indicate that Congress wanted to create an automatic, irreversible, COLA-granting mechanism for federal judges, contingent only upon the grant of a COLA to the General Schedule. The 1989 Act thus expresses a promise the 1989 Congress made to itself and to federal judges, and a wish it made to future Congresses, to provide federal judges with future pay increases. But in 1995, 1996, 1997, and 1999, different Congresses rejected the wish expressed in the 1989 Act, and acted to block the judicial pay increases, as follows:
 
 
 40
 The pay increase that was to take effect on January 1, 1995 was blocked by Section 630(a)(2) of Pub. L. 103- 329, 108 Stat. 2382, 2424 (1994), which provided that "[f]or the purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989 (5 U.S.C. 5318 note), no adjustment under section 5303 of title 5, United States Code, shall be considered to have taken effect in fiscal year 1995 in the rates of basic pay for the statutory pay systems." This law was signed by the President on September 30, 1994.
 
 
 41
 The pay increase that was to take effect on January 1, 1996 was blocked by Section 633 of Pub. L. 104-52, 109 Stat. 468, 507 (1995), using similar language. This law was signed by the President on November 11, 1995.
 
 
 42
 The pay increase that was to take effect on January 1, 1997 was blocked by Section 637 of Pub. L. 104-208, 110 Stat. 3009, 3009-364 (1996), using similar language. This law was signed by the President on September 30, 1996.
 
 
 43
 The pay increase that was to take effect on January 1, 1999 was blocked by Section 621 of Pub. L. 105-277, 112 Stat. 2681, 2681-518 (1998), using similar language. This law was signed by the President on October 21, 1998.
 
 
 44
 Obviously, each of these unambiguous laws--which neither party denies had the intended effect of preventing the planned judicial pay increase for each of the years in question--was passed by Congress and approved by the President before the January 1 date that the COLAs were to take effect. Under Will, put simply, that is the end of our inquiry, and the Judges' cause must fail. As the Supreme Court's analysis of Years 2 and 3 in Will commands, "a salary increase `vests' for the purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges." 449 U.S. at 229. The statutory scheme at issue in Will fixed the effective date of the pay increases as October 1; actions by Congress and the President before that date (Years 2 and 3) were permissible; actions after that date (Years 1 and 4) were not. Here, the only difference in the analysis is that the statutory scheme (28 U.S.C. §§ 461) establishes the effective date of the COLAs as January 1. Because, in each of the years at issue in this case, the President signed the blocking law before January 1, these actions do not violate Article III of the United States Constitution.
 
 B.
 
 45
 On appeal, the Judges again argue that the COLAs "vested," for Article III purposes on January 1, 1991, the effective date of the 1989 Act. That is, the Judges posit that, as of January 1, 1991, federal judges were due COLAs in every subsequent year, subject only to the condition that COLAs were granted to GS employees. The Judges also note that, as of the passage of the blocking statutes in the years at issue, "all steps to finalize the adjustments had been completed." Appellee's Br., at 43. Thus, according to the Judges, by the time Congress and the President acted, their compensation had already been increased, thus making the blocking statutes a diminishment of judicial pay.
 
 
 46
 At oral argument, the Judges' position was highlighted by the following hypothetical. Assume that Congress in 2000 enacts and the President signs a bill stating that "annual compensation for all federal judges shall be increased by $50,000 per judge on January 1, 2005." Then, in 2004, another act is passed and signed that flatly repeals the planned $50,000 pay increase. According to the Judges, the 2004 Act is unconstitutional as a diminishment in judicial compensation. According to the Judges, the $50,000 increase must be paid starting in 2005, notwithstanding the 2004 blocking statute.
 
 
 47
 The Judges' position, as stated in the district court, the briefs here, and at oral argument, evinces a wishful misunderstanding of the Article III "vesting" rule which the Supreme Court established in Will. The central holding of Will is unambiguous: judicial pay increases which are enacted and effective, except in the sense that they are not yet "due and payable" to judges, may be repealed. See 449 U.S. at 228 ("To say that Congress could not alter a method of calculating salaries before it was executed would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Congress."). In Will, the judicial pay raises in Years 2 and 3 were, by statute, due to take effect as of the start of the fiscal year on October 1; no further action was required on the part of Congress to add the COLAs to the compensation of federal judges. There is no difference between years 2 and 3 in Will and the years in question in this case: everything necessary for the effectiveness of the pay increases had occurred before the negating legislation, except for the passage of time to permit pay increases to become due and payable to the judges. The automatic COLAS in Years 2 and 3 were fully effective, as matters of legislation: they only awaited a date upon which they could be added to judicial pay checks. Yet the Supreme Court held that the repeal of those pay raises did not violate Article III. See id. at 226-29. The reason for this holding is that the Supreme Court established a "vesting" rule for Article III that is exclusively focused on whether the pay adjustments have become "part of the compensation due and payable" to judges. Id. at 229.
 
 
 48
 Typically, "vesting" of future interests only requires two components: an identification of the future owner, and certainty that the property would transfer. See, e.g., 2 Blackstone's Commentaries 168; Simes & Smith, The Law of Future Interests, §§ 65, pp. 54-55 (2nd ed. 1956). In Will, the Supreme Court departed from traditional vesting rules to set forth a rule that "vesting," for Article III compensation purposes, in effect requires the actual possession of the additional compensation. See 449 U.S. at 228-29. That is, under the vesting rule in Will, pay increases for Article III judges are left constitutionally unprotected until the judges actually begin to accrue compensation under the increased rates (occurring, of course, at the start of the first pay period when the increased pay is in effect). The Supreme Court in Will reasoned that this rule was required because the Constitution, by design, had left increases in judicial pay "exclusively" with the Congress. Id. at 228. As the Court noted, "it would be particularly ironic if [courts] were to bind Congress to an indexing scheme for salaries when the Framers themselves rejected an indexing proposal." Id. at 228 n.33. Congress, of course, has strong political and practical incentives to provide fair and adequate salaries to Article III judges, including provisions for increases in the cost of living and a reasonable relationship with private sector rates of pay. As the Court in Will noted, however, the Framers deliberately left such decisions to the Congress. See id. at 220 ("The Convention finally adopted [Gouverneur] Morris' motion to allow increases by the Congress, thereby accepting a limited risk of external influence in order to accommodate the need to raise judges' salaries when times changed.").
 
 
 49
 The position adopted by the Judges (and accepted by the district court) reduces to the contention that Congress, once it has enacted a law promising a future pay increase to federal judges, may not, as a constitutional principle, amend downwards or abrogate that promise, irrespective of whether the judges have actually begun seeing the effects of the pay increase in their paychecks. While perhaps a sound equitable principle, this supposed rule presented by the Judges is simply contrary to the rule established by the Supreme Court in Will. See, e.g., id. at 228 ("For Year 2 . . . the [blocking] statute was passed before the Adjustment Act increases had taken effect--before they had become part of the compensation due Article III judges. Thus, the departure from the Adjustment Act policy in no sense diminished the compensation Article III judges were receiving; it refused only to apply a previously enacted formula."). While we can agree with the Judges that the repeated departures from the 1989 Act were perhaps regrettable and ill-considered policy choices, we cannot accept that the Constitution--which as interpreted in Will lodges exactly this type of policy decision with the Congress--forbids it. Indeed, the Supreme Court emphasized that such policy choices are within the constitutional power of Congress to set judicial compensation. The 1989 Act was an admirable and important attempt to address the significant pay gap between federal judges and their counterparts in the private sector. But it did not, for Article III purposes, "vest" the judges with any pay increases. Thus, so long as the Supreme Court permits the rule of Will to survive, any remedy (and responsibility) for the failure of the 1989 Act to consistently achieve its goals must be supplied by Congress, not by the inferior federal courts.
 
 VI.
 A.
 
 50
 In its opinion below, the district court, aware of Will's roadblock, held that the circumstances surrounding the Judges' claims here did not fall within the rules established by the Supreme Court in Will. The district court found that the 1989 Act "differs substantially" from the pay-raise system discussed in Will in three ways, thereby justifying a different answer to the constitutional question:
 
 
 51
 (1) First, the district court noted that the 1989 Act "imposes severe limitations on the outside income federal judges may earn, forbids the receipt of honorar[ia] and imposes mandatory work loads on senior judges." Williams, 48 F. Supp. 2d. at 57.
 
 
 52
 (2) Second, the district court noted that the 1989 Act "revised the process for providing annual cost-of-living adjustments for federal judges" by establishing a "trigger" when there is an adjustment to GS salaries, and that "Congress took control and prescribed the means for determining the annual pay adjustment." Id.
 
 
 53
 (3) And third, the district court noted that the 1989 Act set a five percent cap on the amount of any COLA for federal judges. See id.
 
 
 54
 The court's first and third distinctions are irrelevant to the constitutional question before us: the Judges make no claim that the limitations on outside income established by the 1989 Act are violations of Article III - and they make no claim that they are legally entitled to COLAs as a quid pro quo for restrictions on non-judicial activities. Nor do they suggest that the five percent cap is unconstitutional. To be sure, the Judges' ability to supplement their judicial pay was restricted by the 1989 Act, and notions of equity may suggest that automatic COLAs, when such are awarded to General Schedule employees, should be a trade-off for such restrictions. But the rule of Will permits no equitable amelioration of its harsh bite. And as to the second distinction, it is unquestionable that the 1989 Act revised the mechanics by which judicial pay could be increased. As noted above, the 1989 Act was a deliberate attempt by Congress to ensure that federal judicial pay scales kept pace with private sector salaries. But so was the pay-raise scheme the Supreme Court considered in Will. That Congress reduced the involvement of the President in COLA adjustments under the 1989 Act is also of no relevance: the Court in Will gave no weight to whether the President or Congress provided the impetus to raise judicial salaries. Indeed, in three of the Will years, the President played no role, the recommendation of the agent being left untouched: those years are thus virtually identical to the years in question in this case.
 
 
 55
 The district court clearly erred, in several respects, in its analysis of the statutory system in place during the Will years. First, the district court thought that the "President submitted an Alternative Plan every year." Williams, 48 F. Supp. 2d at 56. The Supreme Court found that the President overrode the agent's recommendation in only one year, Year 4. See Will, 449 U.S. at 205-09. This error is no doubt harmless, but it was just the beginning of the district court's misunderstanding of the way the statutes operated in the Will years. The district court was of the view that no final law was in place to adjust salaries in the Will years until the President took some additional action. Williams, 48 F. Supp. 2d at 56. According to the district court, the President "had until September 30 [in each of the four years] to accept or reject the proposed adjustment." Id. Further, the district court thought that until September 30, it was not clear that there would even be an adjustment. Id. This is a complete and fundamental error. The Supreme Court's opinion in Will expressly states that the President "may submit to Congress before September 1 an alternative plan [to that recommended by the agent] for adjusting federal employees' salaries." 449 U.S. at 204. The Supreme Court further explained that
 
 
 56
 the alternative plan [of the President] controls unless within 30 days . . . either House of Congress adopts a resolution disapproving of the President's proposed plan. If one House disapproves, the agent's recommendation governs. The increases [whether under the agent's or the President's plan] take effect with the start of the first pay period starting on or after the beginning of the federal fiscal year on October 1.
 
 
 57
 Id.
 
 
 58
 The Supreme Court's view of the facts in Will, by which we of course are bound, closely tracks the language of the relevant statutes. Those facts show that the President had until September 1 to override the agent's proposed COLA, which would become payable the following October 1 unless the President stepped in on time. If the President overrode the agent's recommendation, then either House of Congress had until September 30 to override the President's plan and reinstate the agent's recommended COLA. In either instance, a COLA would be part of the compensation of the General Schedule employees and of the federal judges on the following October 1. The Will statutes guaranteed an annual automatic COLA to the General Schedule and to federal judges.
 
 
 59
 Given the express findings by the Supreme Court of how the statutes operated in the Will years, the district court clearly erred in its review of the Will facts. As noted above, the COLA increases in the Will years were an automatic certainty come the first day of the next fiscal year, unless, of course, one house of Congress enacted express blocking legislation before the first day of the next fiscal year.
 
 
 60
 Because the correct understanding of how the Will statutes operate is so important to the resolution of this case, we pressed the parties at oral argument as to their understanding of those statutes. Both sides agreed that the COLAs under those statutes were automatic, without any need for further congressional enactments. The errors of the district court became apparent at oral argument, with the government relying on those errors to emphasize the similarity of the circumstances in Will to the circumstances in this case--and the Judges making no attempt to defend the errors made by the district court in this regard.
 
 
 61
 If the statutory scheme in this case is substantively no different than the one in Will, then there can be no reason to refuse to apply the law stated in Will to the facts of this case. We think it is impossible to distinguish the statutory scheme implemented in 1989, for purposes of application of the Article III compensation vesting rule laid down in Will.
 
 
 62
 The analysis in Will thus turned on the timing of the enactment of the blocking laws--an activity, of course, requiring the participation of both Congress and the President. We cannot accept the district court's view that the differences between this case and the scheme addressed in Will require a distinct Article III analysis. In short, we cannot escape from Will's impact on this case on the ground that the 1989 Act laid down a completely different statutory scheme with entitlement to a different Article III vesting rule than the one laid down in Will.
 
 B.
 
 63
 In addition to its erroneous view that the 1989 Act can be assessed under a vesting rule different from the one stated in Will, the district court relied on an 1803 opinion written by the Circuit Court for the District of Columbia, United States v. More (CC DC 1803), writ of error dismissed for want of jurisdiction, 3 Cranch 159, 2 L.Ed. 397 (1805). In More, Congress had enacted and later abolished a system of fees compensating justices of the peace in the District of Columbia (then Article III positions). After Congress abolished the system, More was indicted for continuing to collect the fees. The Circuit Court held that the abolishment of the fee system was an unconstitutional diminishment of judicial compensation. See id. at 161 n.2. In the district court's view, More controlled the outcome in this case because the 1989 Act provides that judges will receive COLAs in the future, whenever adjustments were made to GS salaries. See Williams, 48 F. Supp. 2d. at 59. Since More held that a future pay arrangement is constitutionally protected, it reasoned that the future pay arrangement of the 1989 Act must also be constitutionally protected.
 
 
 64
 This is a complete misapplication of More, and indeed, simply a replay of the same error committed by the district court in the Will case. The district court opinion in Will held that "on the basis of the More case alone, the only supportable conclusion . . . is that Congress' attempt to eliminate or avoid the [COLA pay increases] is unconstitutional." Will v. United States, 478 F. Supp. 621, 627 (N.D. Ill. 1979) The Supreme Court in Will, however, reversed the district court on this point, expressly rejecting the notion that More is in any way inconsistent with the Article III vesting rule announced in Will. The Court noted that, in More, the fee system was "already in place" at the time that Congress abolished it. Will, 449 U.S. at 228 n.32. Thus, by abolishing the mechanism by which More had been paid for his services, Congress had diminished his compensation. See id. That is, in More, a justice of the peace was paid for his judicial services (his Article III compensation) by receiving a set amount for certain acts performed. That system of compensation is little different from one based on payments for time served, such as being paid per hour, per day, or per year of service. Irrespective of the particular system, formula, or process involved, the protection of Article III is triggered only when judges actually begin to accrue compensation under the scheme. See id. at 228-229. The outcome in More is fully consistent with the vesting rule in Will.
 
 
 65
 The district court thus misunderstood the force of More, and fundamentally erred in thinking that More supported the result reached by the district court on the constitutional question. Indeed, in the light of the fact that the district court in Will pegged its decision in favor of federal judges on its reading of More, only to be unanimously reversed in that regard by the Supreme Court, the district court's reliance on More in this case is no less than surprising. Furthermore, during oral argument in this case, both sides agreed with the Supreme Court's understanding of the facts in More: namely that the fee schedule in suit had been in effect ("already in place as part of the justices' compensation" as stated in footnote 32 in Will) before it was repealed by Congress. Thus Justice More, before the repealer, had performed services and had been paid for them at the schedule rate. This is no different from a judge being paid by the hour or month, or indeed by the year, and then having Congress reduce the rate of compensation at which the judge had previously been paid. For these reasons, the Supreme Court held that More is fully consistent with the proposition that promises of future increases in judicial compensation can be broken, without Article III consequences, if the promise is broken before the increase becomes part of compensation payable to federal judges. See Will at 228 n.32.
 
 C.
 
 66
 The district court's citation to Boehner v. Anderson, 30 F.3d 156, 158 (D.C. Cir. 1994) is no more helpful in support of its answer to the constitutional question in this case. In Boehner, the court analyzed whether the 1989 Act, which also applies to Members of Congress, is inconsistent with the 27th Amendment to the United States Constitution, which prohibits laws effecting pay raises to Members of Congress from taking effect until a congressional election has intervened. The Boehner court determined that it was not, holding that the phrase "shall take effect" in the 27th Amendment referred to the date that the 1989 Act was enacted, rather than the date that the COLAs for Members of Congress were actually paid. See 30 F.3d at 161-62. Thus, because the first pay raise under the 1989 Act was implemented in January 1991, the requirements of the 27th Amendment were satisfied. Id.
 
 
 67
 From the D.C. Circuit's straightforward analysis, the district court and the Judges find a generalizable rule that COLA pay increases "take effect" (i.e., "vest") when the law providing the indexing scheme is enacted, not when the pay increases "become due and payable" under the vesting rule established by Will. However, the district court and the Judges fail to come to grips with the specific holding of Will--that vesting, for federal judges under Article III, occurs only when compensation begins to accrue to the judges, not when a particular adjustment formula is enacted. Boehner considered a very different question: when does a "law" increasing the salaries of Members of Congress "take effect"? As the D.C. Circuit noted, there is little question that the 1989 Act was a "law" that "took effect" in 1989; the COLAs themselves, operating virtually automatically, were not additional laws. See 30 F.3d at 162. This simply has no relevance, however, to the question of whether the judicial pay aspects of the 1989 Act could, consistent with Article III, be revised or abrogated by later Acts of Congress. That question, as we have noted above, is answered in the affirmative by the analysis prescribed in Will.
 
 VII.
 
 68
 The dissenting opinion argues that the Article III vesting rule in Will is inapplicable to this case, because the 1989 Act represents a "political bargain" which was "struck by members of the legislative branch and codified in legislation." The particular bargain to be enforced here is the intent to grant COLAs to federal judges, if granted to the General Schedule, so long as the Judges' compensation from non-judicial activities is restricted by statute. The dissent asserts that the Constitution compels this court to enforce that bargain. The notion that courts must enforce political bargains is the only reason submitted by the dissent for its unwillingness to abide by the rule in Will.
 
 
 69
 The cases cited by the dissent for the proposition that courts should give effect to political compromises struck in final legislation all involve an issue of statutory interpretation. Common to such cases is language such as:
 
 
 70
 As with other problems of interpreting the intent of Congress in fashioning various details of this legislative compromise, the wisest course is to adhere closely to what Congress has written.
 
 
 71
 Rodriguez v. Compass Shipping Co. Ltd., 451 U.S. 596, 617 (1981). Another iteration of the same point colorfully states that:
 
 
 72
 Congress has put down its pen, and we can neither rewrite Congress' words nor call it back to "cancel half a line." Our task is to interpret what Congress has said . . . .
 
 
 73
 Director, Off. of Workers' Compensation Programs v. Rasmussen, 440 U.S. 29, 47 (1979). These cases, in addition to those cited by the dissent, and a host of others, are unremarkable in that they only state the obvious: that when an issue of statutory interpretation is at hand, courts should where possible respect and uphold political compromises struck within the legislature or between the other two branches.
 
 
 74
 If the obvious axiom is applied to this case, treating it as only a case of statutory interpretation, we can all agree that the intent of Congress in 1975, with the Executive Salary Cost-of-Living Adjustment Act, is absolutely clear and beyond any possible doubt: federal judges were to receive COLAs in the future automatically. And the intent of Congress in 1989 is equally clear and beyond any possible doubt: federal judges were to receive COLAs in the future whenever COLAs were awarded to the General Schedule. Congress in 1989 no doubt fully intended, hoped and promised that federal judges would receive COLAs in the future according to the COLA-granting terms of the 1989 Act. We can further agree that this intent, hope and promise was shared in some political compromise. But we cannot escape the plain fact that the intent of the 1975 Congress was no different: it intended that federal judges would receive COLAs in every ensuing year, and because the President signed that bill, we can only presume that he went along with the plan for the future embedded in the statutes. We also cannot escape the fact that the 1975 Act, with its firm promise of future pay increases for federal judges, was the result of a hard-fought political bargain, as well described in the dissenting opinion. If the rule of Will overwhelms the intent and political compromises of the 1975 Congress, as it surely does, then we fail to understand why the rule of Will does not likewise overwhelm the intent of the 1989 Congress.
 
 
 75
 The Supreme Court in Will could easily have employed the rationale of the dissent in its analysis of the statutes in question, to rule that the bargain struck in the legislative process for future COLAs prohibited the vesting rule that the Court established in Will. To that end, the Court could easily have fashioned a vesting rule more consistent with black-letter vesting for future interests, thereby permitting the intent of Congress, as expressed by its legislative processes, to afford constitutional protection, under Article III, for statutorily promised future pay increases for federal judges. For the Court, the "other part" of Article III--the part that reserves to the Congress the sole authority to set judicial pay--stood in the way of traditional vesting rules for future interests. The Supreme Court found the explanation in terms of constitutional law or policy for its vesting rule in the Constitution itself. The Court thus expressed its reasons for rejecting the vesting of future COLAs for federal judges as garden- variety future interests, from a date of statutory enactment, as urged by the dissent.
 
 
 76
 The reason for the dissent's vesting rule, and the only ground on which it finds any difference between the 1975 and the 1989 Acts, is that the 1989 Act included restrictions, for ethical reasons, on the sources of non-judicial compensation for federal judges. Indeed, the dissent posits a conditional vesting rule: so long as the limits on non-judicial compensation exist, future COLAs are vested from the date of enactment of the 1989 Act. If those limits did not exist, presumably the vesting rule of Will would apply.
 
 
 77
 As a first matter, it is clear that Congress has the power to limit the non-judicial activities of federal judges, even if such limitations reduce non-judicial compensation. The Judges do not suggest that the protection in Article III for judicial compensation extends to protection of sources of non-judicial compensation. They do not argue that "taking away" sources of non-judicial compensation diminishes judicial compensation under Article III. It has to be clear that Congress can deny things of value to federal judges without being obligated by the Constitution to remunerate federal judges in return, as in the quid pro quo notion that permeates the rationale of the dissent. The fact that Congress restricted the sources of outside pay for federal judges in the 1989 Act is therefore irrelevant to the question of whether a later Congress, consist with Will, can refuse to deliver a COLA promised by the 1989 Act. Indeed, for those federal judges never having sought compensation for non-judicial activities, there is no legislative "bargain" as posited by the dissent, pursuant to which they could claim constitutional entitlement to a promised future COLA. Only those judges who were counting on future outside non-judicial compensation could claim themselves as third party beneficiaries of the legislative bargain to which the dissent points. We therefore reject the dissent's conditional vesting rule: we do not think that Article III is switched on and off depending on whether in a given year Congress has enacted constitutional legislation that adversely affects some aspect of non-judicial behavior of federal judges.
 
 
 78
 We need not quibble with the dissent's view that courts frequently recognize that federal statutes often, if not always, reflect political bargains, ones hard fought-for and frequently difficult to achieve. We can also accept, for purposes of argument, that the 1989 Act contains some form of pact between "members of the legislative branch," even though that fact hardly distinguishes the 1989 Act from any other legislation. Courts, we can presume, ought to be loath to interfere with political bargains, unless some rule of law requires a court to upset the political bargain struck in a statute. Indeed, separation of powers is all about appropriate respect by the judiciary for compromises and bargains struck in the enactment of legislation. Nonetheless, courts must apply the rule of law, even when the rule of law disrupts some perceived legislative compromise. Anytime a court interprets a federal statute in a way contrary to a significant articulate volume of legislative history, or a way that produces outcry from Congress or the President, that court disrupts the political balance that underlay the statute. And when a court is called upon to strike down a federal statute as inconsistent with the Constitution, of course the political deal that produced the statute is frustrated. In the end, the dissent posits a rule of statutory construction with which we disagree: that when a conditional political bargain is struck involving the compensation of federal judges, the political compromise must be enforced by the courts, as a matter of constitutional law, so long as the bargain remains in place. The dissent's rule, however, completely overlooks the vesting rule in Will. That vesting rule, according to the dissent, simply has no room for application so long as the political bargain remains in place.
 
 
 79
 In the final analysis, the brightest line of distinction between the dissent's view of this case and ours is that the dissent apparently sees the rule in Will as one of limited application, a rule that applies only when Congress has not struck some political bargain where judicial compensation is involved. For the dissent, both Will and this case are ordinary cases raising only questions of statutory interpretation. The dissent attributes to the Will Congress an intent to prohibit future COLAs if blocked by Congress before the due and payable date. We think Will cannot bear such a reading. To decide the case, the Supreme Court's opinion in Will did not explore the intentions of Congress; instead it explored the constitutional limitations on Congress when it seeks to abrogate a future pay raise for federal judges. This case also does not call upon us to discover the intent of Congress: we can agree that the 1989 Congress, like the 1975 Congress, sought to provide future COLAs to federal judges, even to those judges who did not view themselves as having to "give something up" to get the future COLA. Rather than ask a question of statutory interpretation, this case asks if a later Congress can break a future pay increase promise made by the 1989 Act. The later Congresses that broke the promise of the 1989 Congress did so in statutes that need no elaborate statutory interpretation. The blocking statutes mean what they say, and their plain meaning requires no resort to legislative history to discover the political bargain or compromise that led to their enactment.
 
 
 80
 This case and Will are thus not cases decided by ordinary canons of statutory interpretation. The rule in Will is one of general application: until such a time as a future pay raise for federal judges becomes due and payable, according to the test laid down by the Supreme Court, Congress retains constitutional authority to set the compensation of federal judges, even if the exercise of that authority involves the repeal of previously enacted laws that would produce compensation increases at specific future dates. Ordinary canons of statutory construction, designed for application to reveal the intent of Congress, cannot nullify a rule of constitutional law. Will stands at the intersection of congressional authority to set the compensation of federal judges and the provision of Article III that bars Congress from diminishing judicial compensation. It is not the Judges alone who have something at stake in this case. The Congress has at stake its constitutional authority to set the compensation of federal judges. Will has told us when Congress can, and when it cannot, defeat the expectations of federal judges to pay increases that are promised by laws which, when first enacted, are intended to guarantee future pay increases to the federal judiciary. In simple and correct terms: until a future pay increase for federal judges becomes due and payable to federal judges and therefore vests in their favor according to the rule in Will, it is not protected by Article III. The ground offered by the dissent to avoid the vesting rule of Will must be respectfully declined.
 
 CONCLUSION
 
 81
 It is, of course, profoundly disappointing to the Judges that the arrangement for future federal judicial pay increases worked out by the 1989 Congress has enjoyed such an inconsistent life. While we agree with the Judges' view that the continued strength of the federal judiciary depends in part upon a deliberate, consistent, and fair approach to routine cost-of-living salary adjustments, we cannot, consistent with established Article III principles, hold that the Constitution requires the Judges to prevail in this case. The Supreme Court has drawn a clear line between rescissions of planned-but-not-yet- effective pay increases, and reductions of compensation due and payable to Article III judges. In this case, the laws that prevented the 1995, 1996, 1997 and 1999 COLAs from taking effect fall on the former side of the line. Accordingly, we must hold that the blocking statutes were permissible, if regrettable, constitutional exercises of congressional power. The district court's judgment to the contrary cannot stand. The judgment of the district court is reversed, and the case is remanded to the district court with instructions to enter judgment in favor of the United States.
 
 REVERSED AND REMANDED
 
 
 Notes:
 
 
 *
 Judge Plager assumed senior status on November 30, 2000.
 
 
 [1]
 We have consolidated the three appeals before us. No. 99- 1572 concerns the 1995, 1996, and 1997 years, No. 00- 1255 deals with 1999, and No. 00-1254 concerns prejudgment interest. The disposition of the appeal in No. 99-1572 moots the other appeals.
 
 
 [2]
 If necessary, however, we adopt the jurisdictional analysis set out in the dissenting opinion.
 
 
 
 82
 PLAGER, Senior Circuit Judge, dissenting.
 
 
 83
 I respectfully dissent.
 
 
 84
 It is wrong to conclude, as my colleagues do, that the Supreme Court's decision in United States v. Will, 449 U.S. 200 (hereafter "Will"), construing a 1975 Act of Congress, compels us to deny the legislatively decreed COLAs under the 1989 Ethics Reform Act.
 
 
 85
 It is wrong because it attributes to the Supreme Court a misconstruction of the Constitution that the Court's opinion in Will neither supports nor deserves, and it violates the Supreme Court's established canon of constitutional litigation that avoids the making of constitutional rules when statutory interpretation will suffice.
 
 
 86
 It is wrong because it refuses to acknowledge the purpose[1] and intent behind Congress's enactment in 1989 of the Ethics Reform Act, a purpose and intent understood and agreed to by both Congress and the President. And it flies in the face of the Supreme Court's stated policy of honoring legislative compromises when the nature and purpose of the compromise is an established part of the public record.
 
 
 87
 It is wrong because it does a disservice to the judiciary by denying to it the unique protection against arbitrary action accorded to the judiciary for 200 years by the Compensation Clause of Article III, §§ 1 of the United States Constitution.[2]
 
 
 88
 I would affirm the judgment of the district court in favor of the plaintiff judges.
 
 
 89
 *****************
 
 
 90
 I begin with an introduction and overview of the case for affirmance, infra pp. 4-11. Next, in Part I of the opinion, I address the central issue: was the consequence of Congress's purpose and intent behind the enactment in 1989 of the Ethics Reform Act to commit as a matter of law the COLAs provided in that Act, so that the right to the COLAs "took effect" and were "due and payable" when the Ethics Reform Act became law, subject only to the trigger event, the payment of COLAs to the General Schedule employees? For the reasons I shall explain, the correct answer is yes.
 
 
 91
 In subpart A of Part I, infra pp. 11-16, I explain the background and give the history of Congress's efforts to solve the political conundrum presented to Congress by the Constitution's assigning to that body the duty to set its own salaries, as well as the salaries of senior government officials in the other two Branches. In subpart B, infra pp. 16-29, I examine Congress's effort that culminated in the 1975 Adjustment Act, and the Supreme Court's 1980 decision construing that act, United States v. Will. In subpart C of Part I, infra pp. 29-36, I examine in like manner the effort by Congress that culminated in the 1989 Ethics Reform Act, and demonstrate the differences between those two efforts and why the decision in Will does not dictate our understanding of the latter.
 
 
 92
 On pp. 36-41, infra, I summarize, and recapitulate why the correct answer to the central issue requires that we affirm the district court. The reader with limited time who wishes to grasp the kernel of my disagreement with the majority can do so by reading the material on pp. 4-11 (the introduction and overview), and the summary and recapitulation of the case for affirmance, on pp. 36-41.
 
 
 93
 My profound disagreement with my colleagues on the central merits of the case does not preclude me from joining the majority opinion with regard to several peripheral issues. For one, I agree with the unavoidability of having the court decide the case under the Rule of Necessity.
 
 
 94
 I also agree with the majority that the trial court had jurisdiction over the cause, though I find it necessary to address more fully than they the question of the district court's jurisdiction. I find their analysis rather thin; it went only far enough to legitimate their reversal of that court's judgment in the lead case. As I would uphold the district court's judgment with regard to all matters on appeal, I must demonstrate that the court had jurisdiction over all the claims. I do so in Part II of this opinion, infra pp. 42-46.
 
 
 95
 I further join the conclusion reached in the majority opinion that Section 140 does not stand as a bar to the claim of the judges. However, given the history of Section 140, the Comptroller General's repeated insistence that it applies to any COLAs to which judges might otherwise be entitled, and the adherence by subsequent Congresses to the Comptroller General's advice, I believe the issue needs a more thorough exegesis than it receives in the majority opinion in order to be fully persuasive. That is Part III of this opinion, infra pp. 46-54.
 
 
 96
 ******************
 
 
 97
 I begin with an introduction and overview of the case. The essential difference between my view of this case and that of my colleagues is that, in my view, the Supreme Court in its Will decision did not create an immutable, constitutional principle that denies to Congress the power to adopt legislation that it wishes, legislation designed to once again address the thorny problem of government salaries. The majority reads into the 1980 Supreme Court opinion such an immutable principle, the consequence of which is that Congress cannot choose to adopt legislation that differs from the 1975 Act construed in Will; even if Congress did, according to the majority this court cannot apply traditional statutory interpretation tools to enforce such legislation. I do not find in the Will opinion any such exercise by the Supreme Court, ascribed to it by the majority, of such an extraordinary constitutional construction. On the contrary, I read the Will case as a classic exercise of statutory interpretation by the Court, based on the facts of the case in light of the particular statute before it.
 
 
 98
 Furthermore, I conclude that the interpretive rule the Supreme Court utilized in Will, taken on its terms as a rule of statutory construction, when applied to the statute on which these plaintiffs base their claim, results in an outcome different from that in Will. This means that the 1989 Ethics Reform Act must be different from the 1975 Adjustment Act, the act construed in Will, in ways that are legally determinative.
 
 
 99
 Asked in standard statutory interpretation terms, is there persuasive evidence that the 1989 Act, as Congress intended it, operates differently, with different effect, from the 1975 Act? The Government argues that there is insufficient evidence to conclude that Congress intended in 1989 to presently vest any rights to future pay adjustments. Any such adjustments must depend on the will of Congress in any given year. The Government argues that the 1989 Ethics Reform Act is no different legally than the 1975 Adjustment Act, which the Supreme Court in the Will case interpreted as not creating any rights to future benefits, at least not until the benefits became part of the judges' salaries in any given year.
 
 
 100
 The plaintiff judges, as did the district court, reject the analogy to the 1975 Act, arguing that the 1989 Act is different in critical respects. The plaintiff judges further argue that the 1989 Act was intended by Congress to grant protectable rights, rights that could not be ignored by later Congresses, and that Will does not control the outcome here.
 
 
 101
 The Government's position finds support in that there is no express language in the 1989 Act to which the judges can point that clearly states Congress's intention to grant the judges protectable rights. At the same time, the judges' position finds support in that, in important respects, the 1989 Act is different from the 1975 Act.
 
 
 102
 This then is one of those cases in which Congressional intent cannot be determined directly from the plain language of the statute. Though the plain language of a statute often answers issues regarding scope and function, the question we must answer finds no guidance in the specific language Congress used. It is the purpose and structure of the 1989 Act, especially as compared to the 1975 Act, to which we must look and which must be examined in some detail in order to ascertain what Congress intended.
 
 
 103
 Congress, when it enacted the 1989 Ethics Reform Act, clearly had in mind a dual purpose-to remove from itself, from the Executive Branch, and from the Judiciary, the right to earn outside income through particular activities that were considered to have the potential for conflicts of interest, and to replace those sources of income with guaranteed cost-of-living increases whenever standard inflation measures so indicated. I will demonstrate the correctness of that statement by extensive examination of the legislative history of the 1989 Act; also, again by examining its legislative history, I will demonstrate that the 1975 Act, the one construed in Will, had no such purpose.
 
 
 104
 The consequence of this is that both the bar to the prohibited income and the right to the replacement income "took effect" in 1989. So long as the 1989 Ethics Reform Act remains in place, the two are inextricably entwined. "So long as" is important. Consistent with my view, there is no constitutional impediment to Congress, should it so choose in the future, to make yet another effort to solve the problem of salaries for itself and other senior officials. If that effort causes the repeal of the 1989 Act, that carries with it an end to any rights created by the Act. See my discussion of this point infra, pp. 39-40.
 
 
 105
 Again, nothing in Will prevents Congress from enacting such dual purpose, linked legislation as it did in 1989. The majority opinion mistakenly treats the rule applied by the Supreme Court in Will as an immutable constitutional construct, somehow dictated by the terms of Article III of the Constitution, and thus universally applicable to all cases that implicate the Compensation Clause of Article III. See maj. op. at 12: ". . . the deliberative process in Will that led to the constitutional rule of vesting that the Court adopted." (emphasis mine). In effect, the majority renders Congress powerless to achieve the purpose that constituted the driving force behind the 1989 Act. See maj. op. at 35: "The Supreme Court did not explore the intentions of Congress in the Will case; instead it explored the constitutional limitations on Congress . . . . This case also does not call upon us to discover the intent of Congress . . . . Ordinary canons of statutory construction, designed for application to reveal the intent of Congress, cannot nullify a rule of constitutional law."
 
 
 106
 That is an unfortunate misunderstanding of fundamental legal principles. In the first place, it is a long-standing principle that the Supreme Court does not reach out to decide cases on constitutional grounds when the matter can be resolved on other grounds. See, e.g., United States v. Wells Fargo Bank, 485 U.S. 351, 354 (1988) ("[O]ur established practice is to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue."); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring: "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").
 
 
 107
 In Will, the Acting Solicitor General, in his brief to the Court, stated the first question presented: "Whether, as a matter of statutory construction, the [Pay Acts] served to supersede or rescind the cost-of- living increases authorized for Article III judges by the Executive Salary Cost-of-Living Adjustment Act . . . ." Brief for the United States, United States v. Will, at 1 (citations omitted). The Court's concern with what the Constitution commanded was to a large extent a response to the argument of the Acting Solicitor General. His argument was that a congressional act could violate Article III only if it constituted a discriminatory attack on the Judiciary. See Brief for the United States in United States v. Will, third question presented: "Whether the [Acts at issue] violated the Compensation Clause, where the Acts did not represent a discriminatory attack on Article III judges and were not enacted with the purpose or effect of undermining the independence of Article III judges."[3] The Court answered that question by making it clear that the constitutional protection provided by Article III attached whenever the right to the compensation vested under the governing Act, and was not dependent on some vague notion of discriminatory intent.
 
 
 108
 There is nothing in the Compensation Clause that mentions "vesting" of rights, nothing to suggest that the Constitution dictates an immutable rule. What was involved in Will was a question of statutory interpretation. Furthermore, as the majority acknowledges, it is basic property law that rights to property may vest presently even though possession (in this case, of money) is postponed to the future. Indeed, the classic definition of what is called in property law a "future interest" is a vested present right to future possession. I am unwilling to attribute to the Supreme Court the conscious creation of a new and unique "vesting" rule as a constitutional construct, one that is contrary to centuries of common law, and unrelated to any specific language in the Constitution, all without explanation in terms of constitutional law or policy. The obvious explanation for the Will rule is the one I have suggesteda matter of statutory interpretation, which is subject to reinterpretation and considered application as a different statute may require.
 
 
 109
 Indeed, the question here is not what the "vesting" rule should say, but how it should be applied. The language in the Will opinion over which the majority trips is that a salary increase vests "only when it takes effect as part of the compensation due and payable to Article III judges," 449 U.S. at 229 (emphasis mine). See maj. op. at 15: "Pursuant to Will, if Congress and the President wish to prevent a planned increase in judicial compensation, they must do so before the date that the pay increase becomes actually `due and payable' as part of the judges' compensation package."; id. at 20: "[T]he Supreme Court established a `vesting' rule for Article III that is exclusively focused on whether the pay adjustments have become `part of the compensation due and payable' to judges."
 
 
 110
 The majority believes that, because the phrase "due and payable" as applied in Will meant that recipients are not entitled to the prescribed COLAs until the COLAs are actually paid, that must necessarily mean that in every case the money must be received before the entitlement accrues. However, as anyone who has ever had to take a bank loan would know, the phrase "due and payable" always asks: due and payable when, and the answer will vary depending on the terms of the particular transaction. In Will, the Supreme Court read the 1975 Act to require that the COLA was due and payable when it was in fact received. That may indeed be what the 1975 Act required, but, as I explain more fully below, the evidence is overwhelming that the 1989 Act was designed by Congress to operate in a different manner, and for a different purpose. The majority concedes this point: "[T]he whole of the 1989 Act, and its legislative history, indicate that Congress wanted to create an automatic, irreversible, COLA-granting mechanism for federal judges, contingent only upon the grant of a COLA to the General Schedule." Maj. op. at 18.
 
 
 111
 The correct interpretation of the 1989 Ethics Reform Act is, as I shall demonstrate, that the COLAs became due and payable contemporaneously with the barring of the right to outside income, that is, in 1989, subject only to the `trigger' event each year (a condition subsequent, in property law terms) that signaled the need for a cost of living adjustment for federal employees. I refuse to attribute to the 1980 Supreme Court an inability on the part of that Court to anticipate that later Congressional enactments might have different origins and purposes, and might require different understandings. Thus I cannot agree with the majority that the language of Will was intended by the Court to preclude our treating different Congressional acts differently, or, even more oddly, to preclude Congress from writing different legislation.
 
 
 112
 Finally, I conclude that, once the COLAs provided by the 1989 Act are properly `triggered' in any given year, Congress may not by a sudden and arbitrary action, at odds with the terms of its own governing legislation, deny the COLAs to which it is committed. Certainly it cannot in the face of the salutary protection accorded to the judiciary by the specific command of Article III, §§ 1 of the Constitution. To conclude otherwise is to denigrate the carefully crafted provision worked out by the Founders for ensuring the essential independence of the Third Branch.
 
 I. THE CENTRAL ISSUE
 
 113
 A. Congress's Problem: Creating a Federal Pay Structure
 
 
 114
 Ascertaining Congress's purpose in enacting the 1989 Ethics Reform Act requires an examination of the historical context within which the act was crafted, and consideration of the contemporaneous legislative record that accompanied its enactment.[4] Comparing that record with that of the 1975 Adjustment Act will help in understanding the Supreme Court's view of these matters, as expressed in the Court's opinion in Will. And, in addition to looking at purpose, we must also look at structure, in particular the structure of the 1989 Act-considering its provisions in pari materia-and compare that structure with that of the 1975 Act. This, too, will assist in understanding Congress's intent in enacting the two different acts.
 
 
 115
 In order to put in context the purpose and structure of the 1975 and 1989 acts, it is helpful to look back at the history of Congress's efforts at constructing a pay structure for federal employees, particularly senior employees, including the members of Congress themselves. At bottom lies a problem that has plagued the nation since its inception.
 
 
 116
 The Constitution assigns to Congress the responsibility for establishing the compensation to be received by senior federal officials: Members of Congress "shall receive a Compensation for their Services, to be ascertained by Law" (U.S. Const. art. I, §§ 6); the President shall receive "a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected" (U.S. Const. art. II, §§ 7); the Judges shall "receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office" (U.S. Const. art. III, §§ 1).
 
 
 117
 From the very beginning, "the historic turmoil surrounding enactment of salary increases" has been a political problem for Congress. 1989 Commission on Executive, Legislative and Judicial Salaries, Fairness For Our Public Servants at 5 (1988) [hereinafter "1989 Quadrennial Commission Report," or simply "Report"]. The Report cited as an example the statement by the Democratic Convention in 1873, responding to a $2,500 increase Congress had just voted itself: "We condemn and denounce the salary grab, and all Congressmen, Democratic or Republican, who voted for it . . . ." Report at 6. More directly apropos of the problem before us, the 1989 Quadrennial Commission Report further noted that "[f]rom the beginning, the level of compensation for Executive branch officials and for judges has been dominated by the level Congress was willing to legislate for itself." Id.
 
 
 118
 Modern-day federal salary policy begins with the 1967 Federal Salary Act,[5] an attempt by Congress to solve the salary setting problem by changing the process for fixing salary levels. "The Federal Salary Act sets forth as public policy the necessity for a regular review every 4 years of the compensation of the top officials of the three branches of government."[6] The Act established the Commission on Executive, Legislative, and Judicial Salaries, which was instructed to meet and report quadrennially. In the way of government commissions, this became known as the Quadrennial Commission; the Report referred to above was the product of the 1989 Quadrennial Commission's activity.
 
 
 119
 The Commission makes its recommendations to the President regarding salary levels for the senior officials of the three branches; the President in turn makes his recommendations to Congress. The President's recommendations take effect subject to a process for Congressional review. That review process has changed over the years. As a result of a 1985 amendment, the process in effect at the time the 1989 Ethics Reform Act was passed provided that the President's recommendations became effective automatically, unless and to the extent that a joint resolution of disapproval of all or part of the recommendations was agreed to by both Houses within thirty calendar days after the President's submission.[7]
 
 
 120
 In commenting on the overall unworkability of the system, the 1989 Quadrennial Commission said:
 
 
 121
 Over the years, the "Quadrennial Commission" process has sometimes resulted in approval of the President's recommendations and sometimes not. Although the political difficulties Members [of Congress] face regarding salary increases have been somewhat cushioned, these difficulties cannot be eliminated until Congress enacts legislation delegating the final power to set high-level Executive, Legislative and Judicial salaries either to the President or to a bipartisan commission . . . .
 
 
 122
 Report at 7.
 
 
 123
 It is worth noting that the "high-level" officials to which the Commission's recommendations are addressed includes the Vice President and 833 other Executive Branch positions; all Members of Congress and ten Legislative Branch executives, totaling 549; and 1,113 judges plus two Judicial Branch executives.[8]
 
 
 124
 Three years after enacting the 1967 Federal Salary Act and its Quadrennial Commission system, Congress enacted the Federal Pay Comparability Act of 1970 (the "Comparability Act").[9] This Act was intended to address the problem of the disparity between salaries paid to federal government employees and the higher salaries paid to persons in the private sector engaged in comparable work. The Act applied to those federal employees (generally career service employees) who are paid under what are known as the statutory pay systems; this includes persons under the General Schedule, the Foreign Service, and certain groups of professionals in the Veterans Administration. The Act provided for a report based on information from the Bureau of Labor Statistics, and for an Advisory Commission on Federal Pay to recommend to the President, on the basis of the report, appropriate pay adjustments.
 
 
 125
 Over the years the effectiveness of the Comparability Act has been quite limited. For example, as the 1989 Quadrennial Commission noted, between 1984 and 1989 the Advisory Commission made six annual recommendations for increases ranging between 18 and 26 percent; the increases Congress put into effect ranged between 0 and 4.1 percent.[10]
 
 
 126
 Five years after establishing the Comparability Act pay formula for the benefit of general federal workers, Congress in 1975 enacted the Executive Salary Cost-of-Living Adjustment Act (the "Adjustment Act"),[11] which was supposed to provide comparability pay adjustments specifically for Members of Congress, judges, positions under the Executive Schedule (the top level of Executive appointees), and other top positions in the three Branches. The Act was intended to link pay adjustments for senior federal officials to the annual pay adjustment process for the other pay systems.
 
 
 127
 B. The 1975 Adjustment Act and the Will case
 
 1.
 
 128
 United States v. Will, 449 U.S. 200 (1980), was the consequence of a challenge to Congressional blocking acts aimed at preventing COLAs for judges under the 1975 Adjustment Act. In the case now before us, the Government bases much of its argument in support of the constitutionality of the blocking acts involved here on the Supreme Court's pronouncements in Will. The majority agrees with the Government, and relies equally on the language of Will.
 
 
 129
 To understand the Will case, and to see how its pronouncements relate to the case at hand, it is necessary to examine in some detail the terms of the Adjustment Act, and their origins. The Adjustment Act grew out of efforts by concerned members of Congress, in particular in the Senate, to address the inequities in the manner in which salaries were set for senior government officers. In 1973, the Senate proposed that the Quadrennial Commissions be changed to biennial, so that their recommendations for salary adjustments would be made every two years instead of every four. See S. 1989, 93d Cong. (1973) (introduced June 13, 1973; passed by the Senate July 9, 1973). The bill failed in the House. In 1974, the Senate Committee on Post Office and Civil Service undertook hearings to consider three bills (S. 3049, S. 3550, and S. 3551) relating to salary adjustment mechanisms for senior officials. Executive, Legislative, and Judicial Pay, Hearings Before the Senate Committee on Post Office and Civil Service, 93d Cong. (June 19-20, 1974). One bill would raise salaries for executive branch officials pursuant to a recommendation of the President; one would extend the raises to the other two branches; and the third would establish a procedure for annual pay assessment and adjustment for all three branches, doing away with the quadrennial review process.
 
 
 130
 Meantime, in June 1975, the House adopted a minor piece of legislation to bring the Postal Service under the Occupational Safety and Health Act. When the House bill, H.R. 2559, came before the Senate, the Senate Committee on Post Office and Civil Service used it as a vehicle for addressing the salary issue. The original Title I, relating to the Postal Service, was retained, but an entirely new Title II, the "Executive Salary Cost-of-Living Adjustment Act," was added.[12] The new Title, in section 205, provided for adjustments to the salaries of federal judges; other sections contained provisions for adjusting salaries for Executive Branch officials and for officials of the Legislative Branch, including members of Congress.[13]
 
 
 131
 Subsection (a)(1) of section 205 (set out in the footnote below[14] contained the language that provided the formula for an upward salary adjustment for judges any time an adjustment (a COLA) in the rates of pay under the General Schedule "takes effect." This formula was applied to judicial salary rates by later subsections of section 205, which amended the specific statutory provisions contained in Title 28 that specified the rates of pay for the various categories of Article III judges by adding, after each, the phrase "as adjusted by section 461 of this title"-"section 461" being a reference to the codified section where the formula of section 205(a) would be placed.
 
 
 132
 In introducing the bill, Senator McGee, chairman of the committee, explained that discussions had been going on for several months involving his committee, the companion committee in the House, the Comptroller General, the President, and the Chief Justice. "We have united on a very simple legislative proposal for this body, recognizing that our earlier legislation did not anticipate or at least did not foresee the impact of double digit inflation on the reforms that were made in earlier years, both in the comparative law for the civil service employees and for the Salary Reform Act of 1967." 121 Cong. Rec. S25,373 (July 28, 1975). He then described the existing mechanism for General Schedule adjustments under the Comparability Act, and stated that "all the pending measure does is put under the same mechanism . . . those persons at the executive level, . . . and the judiciary and the legislative branches of the Federal Government." Id. "H.R. 2559 does nothing to interfere with this present pay-setting mechanism." Id. at S25,375.
 
 
 133
 Chairman McGee further explained that "[t]his bill would only provide that the annual pay adjustment made for the bulk of Federal employees in the general schedule and other statutory salary systems would be applied at the same time and at the same percentage rate to the salaries of those officials and employees who have received no pay raises since March 1969." Id. at S25,374 (emphasis added).
 
 
 134
 Not unexpectedly, several Senators objected to Title II, and in particular to including Congress in the proposed COLA formula. See, e.g., id. at S25,379 (remarks of Senator Harry F. Byrd: "What this tends to do is this insulates Congress against inflation. And yet, in my judgment, Congress is the major cause of the inflation we are facing today."); see also id. at S25,380 (remarks of Senator Allen, proposing an amendment to eliminate Congress from the bill). After rejecting several efforts to amend, including one to strike Title II in its entirety, the Senate voted 58 to 29, 12 not voting, to approve H.R. 2559 as amended by the committee.
 
 
 135
 When the House considered the amended bill, H.R. 2559, containing the Senate's new Title II, Title II was the subject of a rancorous debate. See 121 Cong. Rec. H25,826-41 (July 30, 1975). The spokesperson for the amended bill, Congressman Derwinski of Illinois, started the debate:
 
 
 136
 The language added in the Senate is not a pay raise for Members of Congress or any of the other positions in the executive or judicial branches mentioned in the bill. It is a procedural change in the law which will allow for a cost-of- living adjustment in October, at the same time that employees under the General Schedule receive the same adjustment. Therefore, talk of an 8.6 percent pay increase directly resulting from this bill is incorrect... We are considering a procedural change in the law at this time and will have the opportunity later this fall to agree or disagree to a percentage adjustment in salaries."
 
 
 137
 Id. at H25,827 (emphasis added).
 
 
 138
 He went on to describe how, since 1969, senior government officials, including judges, had seen the purchasing power of their salaries reduced by as much as 32 percent. This was because their salaries had remained frozen, while the Consumer Price Index, a measure of inflation, had increased 42 percent. The position of these officials was contrasted with that of the General Schedule federal employees, who had received 38 percent comparability salary increases during that period.
 
 
 139
 Mr. Derwinski referred to the annual report of the Chief Justice, given in February 1975, in which the Chief Justice had called for an immediate 20 percent increase in judicial pay scales as a first step toward catch-up. Id. at H25,828. It was noted that the proposed bill contained no catch-up provision, and at most would simply halt further erosion in the pay levels. Ironically, in light of what occurred in subsequent years, speakers both pro and con agreed that in particular the judiciary needed the increases the bill provided; no one spoke against the judiciary.[15]
 
 
 140
 The opposition to the bill centered on whether Congress should give itself a pay increase every time the General Schedule received a cost- of-living adjustment. Several members argued that it was Congress's spending that was the cause of the high inflation the country was then experiencing. To give themselves such raises was to encourage even more profligate spending.
 
 
 141
 The proponents of the amended bill made a particular point that the pay-fixing procedures under existing law failed to deal adequately with the problem of inflation. They pointed to the fact that Congress had rejected the 1974 recommendations of the President for salary adjustments. Id. at H25,829. They argued that, even if adjustments were made, the four-year adjustment cycle under the Quadrennial Commission process was too widely spaced. Efforts to shorten that cycle to two years had been defeated. Id. at H25,830. They introduced into the record a letter from President Ford explaining the critical need for Congress to address the question of pay adjustments for senior officials, and supporting the proposed bill.
 
 
 142
 For our purposes here, it is important to note that both the proponents and the opponents of the bill viewed §§ 461, the section added to the United States Code by Title II of the bill, as establishing nothing other than a formula, a procedural device for adjusting salaries when the time came to make the decision that COLAs should be granted. The proponents recognized that the bill provided for an increase for senior officials when the GS employees received one, but assured the House that there would be a further decision in any given year as to whether a COLA would be granted. The opponents, though referring to the bill as having an "automatic" feature, primarily focused their objections on giving themselves a raise based on the cost of living. See, e.g., the remarks of Congressman Rhodes ("[I]t is with reluctance that I rise to oppose this rule. I do not oppose all of it. I think very definitely that the judiciary is in need of a pay raise. . . . The Congress has more to do with the level of the cost of living than any other part of the Government. . . . I just cannot agree with the idea that we should be put in the position of benefiting by an increase in the cost of living."); Congressman Shuster ("[I]t is wrong for Members of Congress to give themselves an automatic cost-of-living increase because it is the big spenders in Congress who cause the cost of living to rise through deficit spending."). Id. at H25,834.
 
 
 143
 In the end, the House passed the bill with the Senate amendment by one vote, 214 to 213, with 7 members not participating. The President signed the "Executive Salary Cost-of-Living Adjustment Act" into law on August 9, 1975.
 
 2.
 
 144
 Since compensation of judges is set at an annual figure and paid monthly, see 5 U.S.C. §§ 5505, any annual change in salary under the Adjustment Act would take effect at the beginning of the Government's fiscal year, October 1. In October 1975, by act of Congress pursuant to the 1970 Comparability Act, General Schedule salaries were increased by an average of 5 percent. Federal judges and other senior officials covered by the 1975 Adjustment Act received similar increases. In fiscal years 1976, 1977, 1978, and 1979, Congress again provided salary increases for the GS employees pursuant to the Comparability Act, but in each of those years Congress enacted legislation that purported to deny the raises to members of Congress, judges, and the other senior officials covered by the Adjustment Act.
 
 
 145
 The exact details of each of these pieces of blocking legislation, see Will, 449 U.S. at 205-09, and the arguments concerning their scope, are unnecessary to the point of this analysis. Suffice it to say that, as a consequence of their enactment, no judges (or other senior officials) received a COLA for those years.
 
 
 146
 In 1978, 13 federal district judges filed suit against the United States in the District Court for the Northern District of Illinois, alleging that Congress's blocking legislation for fiscal years 1976 and 1977 was invalid as an unconstitutional diminution in salary contrary to the provisions of Article III. The suit was brought as a class action. Subsequently, in 1979, basically the same group of judges brought a similar suit with regard to fiscal years 1978 and 1979.
 
 
 147
 The trial court, which handled both cases, certified the cases as class actions, and rendered summary judgments for the plaintiff judges. The Government appealed to the Supreme Court, where the cases were consolidated. In addition to discussing the scope of certain of the blocking legislation, a large part of the Court's opinion in the Will case was devoted to questions regarding jurisdiction and the application of the Rule of Necessity. We are not concerned with those issues here; it is the Court's treatment of the Compensation Clause issue that concerns us.
 
 
 148
 In addressing the Compensation Clause issue, the Court first expounded on the role of the Clause and its central place in the Founders consideration of Article III of the Constitution. The Court traced the roots of the Clause to the long standing Anglo-American tradition of an independent judiciary: "A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." Will, 449 U.S. at 218. After reviewing the history of the idea that judges' compensation was related to their independence, an idea traced back to an English statute of 1701, the Court explained how both James Madison and Gouverneur Morris were instrumental in crafting the provision in the Constitution which captured the idea that: "The Judges, both of the supreme and inferior Courts, shall . . . receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, §§ 1.
 
 
 149
 The Court noted that, in addition to promoting judicial independence, the Compensation Clause serves to ensure that lawyers who leave a lucrative practice to join the federal judiciary can at least have assurance that their salaries will not be diminished. This assurance, said the Court, "has served to attract able lawyers to the bench and thereby enhances the quality of justice." Will, 449 U.S. at 221 (citing Evans v. Gore, 253 U.S. 245 (1920) and Kent's Commentaries).
 
 
 150
 Turning to the matter before it, the Court began by concluding that, in enacting the blocking legislation, "[t]he clear intent of Congress in each year was to stop for that year the application of the Adjustment Act." Id. at 224. The question was, had Congress acted in a way that constitutionally succeeded in that effort. The Court then analyzed the circumstances that prevailed in each year, with particular attention to exactly when the blocking legislation was enacted.
 
 
 151
 Because of the potential confusion in dates resulting from the fact that the Government's fiscal year does not coincide with the calendar year, the Supreme Court in its decision in the matter referred to these years as years 1 through 4. For consistency, I will do likewise. With regard to year 1, the Court concluded that the blocking legislation was enacted after the COLA increase under the Adjustment Act had taken effect. Under the Adjustment Act, the increase "was operative with the start of the month-and the new fiscal year-at the beginning of the day." Id. at 225. The blocking legislation was signed by the President during the day of October 1, after the salary increase was already in force. The Court held that the blocking legislation "diminished" the compensation of federal judges, and was, as to them, unconstitutional. Id. Since the blocking legislation in year 4 was also effective after October 1 of that year, the same result obtained. Id. at 230.
 
 
 152
 Years 2 and 3 presented a different problem. In both of those years, the blocking legislation was enacted prior to October 1. The only issue, then, was whether Congress, in enacting the Adjustment Act, had intended to "vest" future raises in the judiciary, thus precluding later rescission of the right to the raises. The District Court held that Congress had so intended, and that the blocking legislation in years 2 and 3 were equally unconstitutional. The Supreme Court disagreed, and held that the blocking acts in years 2 and 3, passed before the raises became payable in each of those years, were effective to deny judges the scheduled COLAs.
 
 
 153
 The Government here argues that Will controls the case before us. As a result of a 1990 revision of the 1970 Comparability Act, the effective date for cost-of-living adjustments is the first day of the first pay period beginning on or after January 1.[16] In each of the years in question in these cases, the blocking acts were enacted prior to that date. Just as in years 2 and 3 in the Will case, the Government argues, no vested rights existed in the judiciary prior to the time that the COLAs actually became part of the judges compensation in each year. Thus the blocking legislation, enacted before the adjustment to the salaries appeared in the paychecks, did not run afoul of the Compensation Clause. The parallel to the case at hand is obvious, and thus a key issue in this case is the Supreme Court's treatment of the Adjustment Act in Will, and whether the circumstances in Will dictate the outcome here.
 
 
 154
 The Supreme Court began its consideration of the matter by stating the obvious: the Compensation Clause does not erect an absolute ban on all legislation that conceivably could have an adverse effect on compensation of judges. Id. at 227. Thus judges must pay income taxes along with all other citizens. O'Malley v. Woodrough, 307 U.S. 277 (1939).
 
 
 155
 Importantly, the Court, following the lead of both the Senate and House proponents of the legislation, characterized the Adjustment Act as an act that "did not . . . alter the compensation of judges; it modified only the formula for determining that compensation. Later, Congress decided to abandon the formula as to the particular years in question." Will, 449 U.S. at 227. From this the Court concluded that Congress's "departure from the Adjustment Act policy in no sense diminished the compensation Article III judges were receiving; it refused only to apply a previously enacted formula." Id.
 
 
 156
 In response to the plaintiff judges' argument that this case is different from Will because the statute here is not simply a formula for determining compensation, the Government points to other language in the Will opinion that suggests a broader rule. As I noted at the beginning of this opinion, there is language in Will that "a salary increase `vests' for purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges." Id. at 229. The Government notes further that the Court went on to say that the Compensation Clause did not prohibit Congress from repealing the "planned but not yet effective" COLA for year 2 (and necessarily 3) when it acted before October 1, "the time [the COLA] first was scheduled to become part of judges' compensation." Id. The Government finds this language conclusive of the issue before us.
 
 
 157
 I disagree. As I have explained, the statement that a salary increase vests for purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to a judge necessarily asks the question: When is the salary increase due and payable? Though I can agree with the Government that, read broadly, and without due consideration for differences between the Adjustment Act and the Ethics Reform Act, this language could be applied undiscriminatingly to the case before us, I decline to read the language independent of the context in which it was written, and without regard to important differences between the two statutes at issue.
 
 
 158
 In the Supreme Court's view, as I have noted, the purpose of the 1975 Adjustment Act was simply to establish a formula and a mechanism for applying it, so that Congress, when and if it chose to grant senior government officials a cost of living increase, would have in place the structure for doing so. The debate in the Senate and particularly the House, with special reference to the remarks of the sponsors, quoted above, supports that view.
 
 
 159
 As the Court viewed it, nothing in the history of the Act, or in its structure, suggested any commitment by Congress. The Court described the Act as simply "a method of calculating salaries" which Congress should be able to alter before it is executed. Id. at 228. To hold otherwise, said the Court, "would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Congress." Id. In a footnote following this statement, the Court analogized the formula provided in the Act to "an indexing scheme." Id. at 229 n.33. Thus the Court concluded that the Adjustment Act itself did not cause future COLAs to vest, at least not until the scheduled date when the increased payments, pursuant to the formula, were actually paid. As a result, in two of the years at issue Congress effectively precluded the mechanism from operating to grant COLAs; in two of the years Congress failed to act in time so that the established mechanism operated as prescribed.
 
 
 160
 C. The 1989 Compensation Issue and the Ethics Reform Act
 
 1. The Quadrennial Commission Report
 
 161
 The 1975 Adjustment Act was only one of the compensation statutes that the 1989 Quadrennial Commission, in its Report on government salaries, summarized with the words: "their application to date has failed to achieve comparability by a wide margin." 1989 Quadrennial Commission Report at 13. The Report documented the continuing loss in purchasing power sustained by senior officials over the past twenty years: "Even though senior level federal salaries have been increased . . . since 1969, the current salaries of [these officials] have declined in constant dollars to approximately 65% to 70% of their salaries in 1969. In contrast, other wage and salary earners . . . have on average modestly increased their purchasing power in constant dollars by about 1.5% since 1969." Id. at 13. The reference to the year 1969 stems from the fact that 1969 was adopted as the baseline year for salary comparisons by the Quadrennial Commissions, as well as by the Administrative Office of the United States Courts for judicial salary studies. That was the first year in which Congress allowed to go into effect a President's recommended federal pay raise, based in turn on the recommendations of the First Quadrennial Commission.
 
 
 162
 The 1989 Quadrennial Commission then made specific recommendations regarding salary levels for the three Branches. For the Executive Branch, the Commission was particularly concerned about compression at the top. This was the problem created by the statutory salary structure for senior executive officials, causing the salaries of the lower levels of such officials to be frozen for years.[17]
 
 
 163
 For the Legislative Branch, the Commission focused on the issue of honoraria-"payments for public appearances to deliver a talk or engage in a colloquy at the invitation of some non-governmental group, often one with a material interest in pending or anticipated legislation." Report at 24. The Commission detailed the problems with the widespread practice of accepting honoraria (Congressional data reported some $9.8 million in honoraria received in 1987 by Members of the House and Senate),[18] and noted that "[t]he only principled argument that can be made for the practice of accepting honoraria is that official salaries are far too low and must be supplemented by honoraria so that a public official can meet his minimum family obligations." The Commission called for the practice to be terminated by legislation "at or about the time that the Commission's recommended salary increases . . . are allowed to take effect." Id.
 
 
 164
 With regard to judicial salaries, the 1989 Quadrennial Commission Report detailed the inadequacies of current judicial compensation, and stated that "[t]he constant dollar value of federal judges' salaries has been eroded to less than 70% of what it was in 1969." Id. at 28. With regard to the honoraria issue, the Report noted that, compared to the House and Senate, the acceptance of honoraria has remained a relatively minor source of supplemental income for the judiciary, but that "[i]f Congress allows substantial increases for all branches to take effect while it also abolishes honoraria for its own members, it is appropriate that honoraria be abolished in all three branches." Id. at 30.
 
 2. The Task Force Report
 
 165
 At the same time that the 1989 Quadrennial Commission was conducting its hearings on salaries-hearings in which Members of Congress, Executive officers, and judges participated-and was developing its report, Congress itself was engaged in a comprehensive review of ethics rules and regulations. A Bipartisan Task Force on Ethics was appointed in February 1989 by the Speaker of the House, charged with reviewing all rules, regulations and statutes governing the official conduct of members of the House. In November 1989 the Task Force issued its report. Report of the Bipartisan Task Force on Ethics on H.R. 3660, Government Ethics Reform Act of 1989, 101st Cong. (1989), 135 Cong. Rec. H9253 [hereinafter "Bipartisan Task Force Report"].
 
 
 166
 The report stated that the principal areas addressed by the Task Force were subjects such as gifts, honoraria and outside earned income, financial disclosure, and use of official resources. The report went on to note, however, that "[d]uring the course of its review, the task force also examined issues relating to the compensation of Members and other high government officials." Id. at H9253. The recommendations of the Task Force were contained in what the report described as "the most far-reaching government-wide ethics legislation in over a decade." Id. This was the origin of the 1989 Ethics Reform Act.
 
 
 167
 The proposed act as recommended by the Task Force dealt with a number of issues, some of which were directed specifically at the House, its rules and practices, and some of which were addressed government- wide. The proposed legislation contained an outright ban on honoraria for all government officials, and imposed severe restrictions on outside earned income. It reconstituted the Quadrennial Commission into a new Citizens Commission on Public Service and Compensation, and made that commission's salary recommendations, through the President, subject to Congressional approval, rather than veto. It provided for House (and later Senate) ethics rules changes, and for tightened financial disclosure requirements.
 
 
 168
 Importantly for our purposes here, the Task Force report and recommendations spoke directly to the issue of the relationship between placing limitations on honoraria and outside earned income, and the need for adjustments in the salaries of upper-level government officials. The Task Force noted that, of the seven commission salary reports and recommendations issued during the twenty-two years in which the Quadrennial Commission process for salary adjustments had been in effect, only three had been implemented. Id. at H9264. Most recently, Congress in February 1989 had rejected the 51 percent pay increase requested by the President, which request was based on the recommendation of the 1989 Quadrennial Commission. Id.
 
 
 169
 The Task Force stated, "Directly related to this problem are the attempts by some top officials who remain in government to augment their salaries through outside activities, simply to keep up with the rising cost of living. . . . The important point is that [the commissions][19] which viewed these problems from different perspectives came to the basic conclusions that top public officials should be better compensated, that honoraria should be banned, and that outside employment should be tightly restricted." Id. at H9264. The Task Force then recommended that the 1989 and 1990 comparability adjustment that went to other federal workers but was denied to top government officials, including judges, be restored. The Task Force recommended further that beginning in 1991 a separate index, tied to the rate of change in the Economic Cost Index (ECI), be used to establish cost-of- living increases for these officials, and that top Executive Branch officials, Members of Congress, and judges should receive an immediate 25 percent salary increase, all "as part of a comprehensive ethics package which both abolishes honoraria and imposes strict limits and restrictions on any outside income and employment." Id. at H9265 (emphasis added). The Task Force further elaborated on the connection between adequate compensation and restrictions on outside income, saying:
 
 
 170
 The task force wishes to emphasize that it considers the salary provisions of its recommendations to be an integral part of the total ethics package being proposed. Serving as a senior government official is and should be a full-time job and should be compensated accordingly. Along with adequate compensation there should be less need to supplement income from outside sources.
 
 
 171
 Id. (emphasis added).
 
 
 172
 Legislation entitled the "Government Ethics Reform Act of 1989," containing the recommendations of the Task Force, was submitted as H.R. 3660 on November 15, 1989, and introduced in debate the next day. In his opening remarks, Congressman Fazio, one of the sponsors and co-chair of the Task Force, noted that "this comprehensive overhaul of House ethics rules and conflict of interest laws has the full approval of the President, as well as Democratic and Republican leadership in the House." 135 Cong. Rec. H29,482 (1989).
 
 
 173
 In discussing the changes regarding future COLAs, Congressman Fazio stated: "A final, important part of the compensation package is included in section 304. Beginning in 1991, senior officials will be governed by changes in the employment cost index. . . . This should remove senior salaries from their current vulnerability for political demagoguery. Our objective is to maintain fair annual COLA's for all employees, including Members, judges, Cabinet, and other executive level personnel." Id. at H29,483 (emphasis added).
 
 
 174
 Under the bill as proposed, General Schedule COLAs would continue to be based on the standard cost-of-living index, while the COLAs for senior officials, including judges, would be based on the Economic Cost Index ("ECI").[20] The ECI is not actually a cost-of-living index as that is generally understood, but instead reflects private sector changes in wages and salaries. Under the proposed change, the COLAs to be given would be the ECI as determined by the Bureau of Labor Statistics, less one half of one percent, with a cap of 5 percent in any one year.
 
 
 175
 Congressman Kastenmeier, chair of the Subcommittee on Courts, Intellectual Property, and the Administration of Justice, rose in support of the bill, and stated: "I compliment the authors of this bill for their foresight in including provisions relating to a salary increase for Federal judges, automatic COLA's for judges, and a senior judge certification procedure." Id. at H29,497.
 
 
 176
 Several Congressmen who rose in opposition to the pay raise portions of the bill objected to the fact that the pay raise provisions were integrated into the ethics reform provisions, and that there would be only one vote on the entire package.[21] The proponents of the bill agreed that the bill was a package, and was so intended. Congresswoman Martin, another sponsor and co-chair of the Task Force, stated: "The Ethics Reform Act of 1989 is a comprehensive and interrelated package that either rises or falls on its merits-one bill, indivisible." Id. at H29,484. The bill passed the House 252 to 174. Id. at H29,512-13.
 
 
 177
 When the bill was taken up by the Senate, there was a contentious debate between Majority Leader Mitchell and Senator Helms over whether the pay raise provisions should be separated from the ethics reform provisions, Senator Helms insisting that the two should be considered separately. Senator Helms lost, and the Senate passed the bill as a package, but with special provisions applicable to the Senate for phasing in the limits on outside income. The final bill, as passed by both the House and Senate, became the Ethics Reform Act of 1989, Public Law 101-194, and was signed into law by the President on November 30, 1989. The final bill included the provision for COLAs for judges and other senior officials as recommended by the Task Force.
 
 
 178
 ************As the discussion demonstrates, in enacting the 1989 Ethics Reform Act Congress had a different purpose, and utilized a different structure, than when it enacted the 1975 Adjustment Act, the act that was construed by the Supreme Court in Will. The purpose of the 1989 Act was to reform certain practices involving money-raising efforts by senior government officials that caused questions about conflict of interest and related ethical concerns. These questionable practices involving fund raising from private sources were to be prohibited, in exchange for more adequate government funding. The more adequate government funding had two components. One was an immediate "catch-up" increase in salaries for these officials. The other was a commitment to regular annual COLAs whenever inflationary pressures warranted.
 
 
 179
 The structure of the Act reflects its purpose. In addition to the immediate catch-up increase, the Act provided that there would be an automatic pay rate adjustment for senior government officials any time a COLA was awarded to General Schedule government employees. Congress's clear purpose and intent was to compensate senior government officials, through automatic pay rate adjustments, for the continued prohibition against access to private sources of funding.
 
 
 180
 There is no ambiguity about Congress's intent. The committed pay adjustments were in exchange for the prohibitions on outside earnings the Congress imposed on itself, as well as on the other officials covered by the act. Pay adjustments were to be automatic; whenever increases in the cost of living, previously met by those outside earnings, were needed, they were to be met instead by salary rate adjustments. The President and his representatives played a pivotal role in the negotiations leading to the adoption of the Act, and were active participants in the bargain struck.
 
 
 181
 When a political bargain is struck by members of the legislative branch, and codified in legislation, it is appropriate that courts recognize and honor the bargain.
 
 
 182
 In the case of legislation, parties to a statutory contract are the members of the legislative coalition that enacted the statute, and the contract is an agreement over public policy. In the tradition of the economic analysis of contract law, . . . the methods employed by the courts to interpret legislation should be consistent across cases, should be faithful to the bargain struck by the contracting parties, and should take into account the feedback effect of interpretive principles on the efficiency of future negotiations and agreements.
 
 
 183
 McNollgast, Positive Canons: The Role of Legislative Bargains in Statutory Interpretation, 80 Geo. L.J. 705, 705-06 (1992).
 
 
 184
 The Supreme Court in recent years has expressly recognized the role of legislative compromise in the interpretive process.[22] See, e.g., Gen. Motors Corp. v. Romein, 580 U.S. 181, 191 (1992) (upholding the statutory provisions at issue, stating that they were necessary to "preserve the delicate legislative compromise that had been struck by the 1980 and 1981 laws"); Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 747 (1989) ("[T]he enactment of the 1965 compromise . . . demonstrates that Congress intended to provide . . . ."); id. at 748 n.14 ("Strict adherence to the language and structure of [an] Act is particularly appropriate where, as here, a statute is the result of a series of carefully crafted compromises."); United States v. Taylor, 487 U.S. 326, 336 (1988) ("[Appellate] review must serve to ensure that the purposes of the Act and the legislative compromise it reflects are given effect."); see also VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1582 (1990) (discussing the role that legislative compromise played). For a collection and discussion of the relevant Supreme Court cases, see Courtney Simmons, Unmasking the Rhetoric of Purpose: The Supreme Court and Legislative Compromise, 44 Emory L.J. 117 (1995).
 
 
 185
 That later Congresses, perhaps with different members and different political agendas, may choose to pursue different goals does not change the nature of the compromise struck and the resulting purpose that the 1989 Congress had when it enacted the Ethics Reform Act. As I read the statute and the record that led up to its enactment, Congress's purpose and intent was to commit itself to making the salary rate adjustments for senior officials due and payable with the enactment of the Ethics Reform Act. The adjustments were to be automatic, subject only to the `trigger' in any given year of a COLA to the General Schedule employees.
 
 
 186
 So long as Congress chooses to keep in place the 1989 legislation containing both the prohibitions on fund-raising activities and the concurrent commitment to continued public funding in exchange therefore, I see no alternative but to conclude that Congress intended to commit itself to make the payments provided for under the Act. In terms relevant to the issue before us, the entitlement of the beneficiaries of the Act to those exchange payments "took effect" with the enactment of the prohibitions.
 
 
 187
 The majority purports to reduce the judges' position "to the contention that Congress, once it has enacted a law promising a future pay increase to federal judges, may not, as a constitutional principle, amend downwards or abrogate that promise . . . ." Maj. op. at 22. I do not believe that the judges made any such simplistic contention. At oral argument Judge Clevenger posed to counsel a hypothetical that posed such a simplistic case, see maj. op. at 19, to which he received a simplistic answer. Neither the question nor the answer addressed the underlying issue of context or purpose behind the legislation.
 
 
 188
 The majority devotes some pages to attacking the opinion of the district court in this case, maj. op. at 23-30, and particularly the district court's view of United States v. More. I need not engage in that debate. On appeal we review judgments, not opinions. The correctness of the district court's judgment in favor of the plaintiffs is the issue before us.
 
 
 189
 In my view, for the reasons I have explained, the judgment of the district court was correct. Any effort by Congress after 1989 to deny the payments, once a `trigger' award to the General Schedule had been made, was an unconstitutional diminution in compensation in violation of Article III of the Constitution. As a result of the legislative compromise reached, and by Congress's own purpose and intent, the right to those COLA adjustments vested, were in effect and due and payable, with the enactment of the 1989 Ethics Reform Act. Nothing in Will is inconsistent with that result, and certainly there is nothing in the Constitution to dictate otherwise. On the contrary, to conclude otherwise is to deny to Congress the power to make such a decision, and is to undermine the judiciary's right to benefit therefrom, both a power and a right expressly granted by the Constitution.
 
 
 190
 This said, there should be no misunderstanding about what I would hold. In my view, Congress was under no obligation to commit itself to future compensatory payments to senior officials as a precondition to establishing its ethics standards. That was a choice Congress made. Further, Congress is under no obligation to keep in place the mechanism, contained in the 1989 Ethics Reform Act, for compensating senior officials, including judges. That is a choice open to Congress. As the recited history of federal salary law demonstrates, Congress from time to time has revised the salary laws in an attempt to find a solution to the political dilemma arising from setting its own compensation, a dilemma to which it has chosen to tie senior executive and judicial salaries as well.
 
 
 191
 Nor does my view say anything about whether the blocking legislation enacted by later Congresses was effective to deny to themselves or to Executive Branch officials the adjustments committed to them by the 1989 Congress. Not every failure of Congress to live up to its commitments has a remedy in the courts. To the extent a Congressional commitment is not backed up by some legally-enforceable rule of law, such as that of contract law, see, e.g., United States v. Winstar, 518 U.S. 839 (1996), or, in the case of the federal judiciary, the constitutional command of Article III, there may be no judicially cognizable remedy for the wrong.
 
 
 192
 What I would hold is that, once Congress put in place the 1989 Ethics Reform Act, with the intent and purpose of committing itself to this particular solution to its salary dilemma, in exchange for the prohibited activities specified in the Act, the Act must be construed as Congress intended it. Given the purpose and intent with which Congress acted in 1989, it is inconsistent with what Congress did to have later ad hoc enactments purport to provide otherwise. Article III of the Constitution provides protection for the judiciary against such arbitrary action.
 
 
 193
 Unlike my colleagues in the majority, I do not believe the Supreme Court intended to deny to Congress the power to make such commitments. This is not a case of the Judicial Branch commanding Congress to carry out an announced future intent, as was the case in Will. Rather it is a case of the courts enforcing the will of Congress, and recognizing Congress's purpose, that of fulfilling an obligation it chose to impose upon itself. Given that purpose, I can only conclude that the blocking acts passed in 1995, 1996, and 1997, as well as in 1999, violated the constitutional command of Article III, and were ineffective to deny the plaintiff judges and all members of the class the pay rate adjustments committed to them by the 1989 Act.
 
 II. THE JURISDICTION QUESTION
 
 194
 The complaint was filed against the United States by the plaintiff judges in the District Court of the District of Columbia. The complaint alleged jurisdiction in the trial court under the Little Tucker Act, 28 U.S.C. §§ 1346(a)(2), as well as under 28 U.S.C. §§ 1331, the general federal jurisdiction provision. After judgment was rendered by the trial court, the Government, faced with a judgment adverse to its position, took its appeal to this court.
 
 
 195
 The Little Tucker Act grants concurrent jurisdiction to district courts and the Court of Federal Claims over money claims against the United States "not exceeding $10,000 in amount." If a claim against the United States exceeds that amount, it may be brought only in the Court of Federal Claims, under the (non-little) Tucker Act, 28 U.S.C. §§ 1491. This court has exclusive appellate jurisdiction over judgments rendered under either act. 28 U.S.C. §§ 1295(a)(2), (3).
 
 
 196
 In its appeal, the Government concedes that the district court had jurisdiction under the Little Tucker Act over parts of the case, and hence this court would have appellate jurisdiction over those parts. Though not seeking reversal of the entire judgment on jurisdictional grounds, the Government raises questions regarding the jurisdictional consequences if the amounts claimed for any one judge, covering several years, are added together and treated as one claim.
 
 
 197
 Furthermore, if the case is thought to arise under the general jurisdiction provision of §§ 1331, and not under the Tucker Acts at all, an appeal from the case would go to the regional circuit court, in this case the Court of Appeals for the District of Columbia, and not to this court. However, neither the Government nor the plaintiff judges have challenged jurisdiction of the district court under the Little Tucker Act, or the appellate jurisdiction of this court based on that Act. Since the Government took its appeal here, the Government necessarily accepts the theory that the core source for jurisdiction in the trial court was the Little Tucker Act.
 
 
 198
 The Government's concern focuses on the possible implications of basing the suit on that Act. The judges allege for the year 1995 that they were unlawfully deprived of the value of a cost-of-living increase for that year. The parties agree that the amount at issue per judge is about $2,500, and in any event well below the jurisdictional maximum of the Little Tucker Act. The Government notes, however, that the $2,500 allegedly owed for 1995 would also be unpaid in 1996, so that another $2,500 would be owed for that year and each year thereafter. If the annual amounts unpaid in 1995 and in each of the succeeding years are aggregated, with interest, the total at the time a final judgment is affirmed would exceed the $10,000 jurisdictional limit of the district court. The same analysis would have to be made for each of the other years at issue.
 
 
 199
 The Government, though not urging this view of the matter, suggests several possible remedies. One is to accept jurisdiction in the district court under the Little Tucker Act, but require the judges to waive any claim to aggregated amounts in excess of the $10,000 limit. Another is to permit the district court to transfer to the Court of Federal Claims those causes of action that involve aggregated amounts in excess of $10,000.
 
 
 200
 I appreciate the Government's attention to this matter. Fortunately I find the question readily resolved without resort to the Government's creative remedies.
 
 
 201
 I see no reason for aggregating the several causes of action alleged by the plaintiff judges. Each claim for damages for moneys wrongfully withheld in any given year for each claimant judge stands as a separate claim or cause of action. Thus the money alleged to be due the judge for 1995 is one claim. The alleged failure of the Government in 1996 to again make a payment due for that year is yet a separate cause of action. And so for each year thereafter. By like token, the alleged failure of the United States to pay a required adjustment first owed for 1996 (presumably in the same $2,500 range) creates a separate cause of action, different from that related to the 1995 causes of action, so that by the year 1999, for example, any one judge may have multiple causes of action applicable to that year's damages.
 
 
 202
 Though at first blush this may appear complicating, it is in fact a simpler and more straightforward treatment of the issue than the various perturbations that can be imagined under any theory of agglomeration. Furthermore, it is consistent with the approach this court took in the Hatter cases. The Hatter cases also involved a claim by judges that certain Congressional enactments had resulted in depriving them of money that was due them over a period of years. In Hatter v. United States, 185 F.3d 1356 (Fed. Cir. 1999) (Hatter VII), a panel of this court had accepted the Government's argument that, for jurisdictional purposes involving the application of the statute of limitations, we should treat each judge's claim as encompassing all moneys due such judge for the entire period of years involved.
 
 
 203
 On petition for rehearing en banc, brought by the plaintiff judges, the decision of the panel on this point was reversed. Hatter v. United States, 203 F.3d 795 (Fed. Cir. 2000) (en banc) (Hatter VIII). The en banc court held that, under our governing precedent, in particular the case of Friedman v. United States, 159 Ct. Cl. 1 (1962), the claims should have been treated as stating a separate cause of action for each pay period, and the jurisdiction of the trial court with regard to whether individual causes of action were time barred should be determined accordingly. The analysis set out in Friedman applies with equal force here. It is the same analysis, and we are governed by the same precedent, that governed the en banc court's result in Hatter VIII. (I note that the Government did not have the benefit of the decision in Hatter VIII when it submitted its briefs in these cases.) It would be improper to treat the analogous question of the trial court's jurisdiction under the Little Tucker Act differently from the separate cause of action limitations theory enunciated in Hatter VIII.[23]
 
 
 204
 For purposes of this case, it is not necessary to decide whether the proper unit for determining the jurisdictional amount is the dollar amount allegedly due each judge each month, which is how judges are paid, and as it was understood in Hatter VIII, or whether it is the amount due each judge on an annual basis, as the discussion in the briefs has presented it. Either way, the amount for each cause of action is well below the Little Tucker Act limit. This treatment of the issue disposes of any question about the jurisdiction of the trial court over all of the claims, as well as any question regarding this court's jurisdiction to hear the appeal.
 
 III. THE SECTION 140 ISSUE
 
 205
 As I stated at the beginning, I agree with the majority that Section 140 of Pub. L. 97-92 does not stand as a bar to the judges' suit. However, I believe that more needs to be said about it to explain why adequately.
 
 
 206
 The decision in Will, holding that two of the annual increases vested despite Congress' attempts to block them, did not meet with unanimous approval among certain Congressional officers. In the immediacy of the event, Senator Robert Dole responded to the Court's decision by attaching to a then-pending continuing appropriations resolution a one-paragraph statement that read, in relevant part:
 
 
 207
 Notwithstanding any other provision of law or of this joint resolution, none of the funds appropriated by this joint resolution or by any other Act shall be obligated or expended to increase, after the date of enactment of this joint resolution, any salary of any Federal judge or Justice of the Supreme Court, except as may be specifically authorized by Act of Congress hereafter enacted . . . .
 
 
 208
 Beyond statements by Senator Dole made at the time, and which he later recanted (discussed below), there is no legislative history explaining the purpose of the provision beyond its text-the provision was not the product of any committee deliberation or recommendation, nor was it considered or debated by the Senate or the House.
 
 
 209
 Public Law 97-92, enacted December 15, 1981, to which Section 140 was attached, was a joint resolution providing for continuing appropriations for specified governmental units for fiscal year 1982. H.R.J. Res. 370, Pub. L. No. 97-92, 95 Stat. 1183 (1981). Under section 102(c) of Public Law 97-92, the "authority granted" by the resolution was available, unless otherwise provided in subsequent legislation, from December 15, 1981 until March 31, 1982. The March 31 termination date was later extended to September 30, 1982. H.R.J. Res., Pub. L. No. 97-161, 96 Stat. 22 (1982).
 
 
 210
 Because Section 140 seemed to single out the salaries of the judiciary for treatment different from that of all other federal employees, including Congress itself, it was not long after the appropriations resolution expired in September 1982 that the question arose as to the continuing vitality of the provision. As a general rule, "[s]ince an appropriation act is made for a particular fiscal year, the starting presumption is that everything contained in the act is effective only for the fiscal year covered." 1 United States General Accounting Office, Principles of Federal Appropriations Law 2-29 (2nd ed. 1991) [hereinafter Principles]. Thus rules of both the Senate and the House of Representatives prohibit `legislating' in appropriations acts. Id. at 2-28.
 
 
 211
 Nevertheless, on occasion, when the "language used . . . or the nature of the provision makes it clear that Congress intended it to be permanent," the Comptroller General, the head of the General Accounting Office, has opined that a provision contained in an appropriations act should be considered permanent legislation, with continuing vitality even after the expiration of the appropriations bill itself. See Principles at 2-29 to 2-33.
 
 
 212
 By letter dated October 1, 1982, the Comptroller General advised the chairman of the House Committee on Appropriations that, in the Comptroller General's view, Section 140 should be considered to be permanent legislation. The Comptroller General stated that "[s]tanding alone, the language of Section 140 `by any other act * * * after the date of enactment of this resolution' is not persuasive as to permanency. However, the additional phrase `except as may be specifically authorized by Act of Congress hereafter enacted' does lead us in that direction." Furthermore, the Comptroller General could not find any function for the provision unless it had continuing application after September 30, 1982, since the next regularly scheduled COLA would not take effect until October 1 of that year. From this, the Comptroller General reasoned that the provision must have been intended to have effect after the normal termination of the appropriations resolution.
 
 
 213
 Over the objections of the judiciary, this opinion was followed in subsequent opinions of the Comptroller General regarding salary increases for judges. See Federal Judges, 62 Comp. Gen. 54 (1982) [hereinafter Federal Judges I]; Federal Judges II, 62 Comp. Gen. 358 (1983); Federal Judges III, 63 Comp. Gen. 141 (1983). In one year the Comptroller General concluded that Congress had provided the necessary "specifically authorized" act of Congress, see Federal Judges II; in other years not, see Federal Judges I; Federal Judges III.
 
 
 214
 In 1986, Circuit Judge Frank M. Coffin, then chairman of the Judicial Conference Committee on the Judicial Branch,[24] asked the Comptroller General to re-examine his position in light of new evidence regarding Congress's intent at the time of enactment of Section 140. The new evidence was a letter from Senator Dole, purporting to clarify his intent with respect to Section 140 when he introduced it as an amendment to the 1981 appropriations resolution. As the Comptroller General explained, Senator Dole's letter stated that the amendment was offered as an accommodation to another Senator; that it was prepared by that Senator's staff; and that the intent was to limit the application of the amendment to the fiscal year in which it was enacted. Federal Judges IV, 65 Comp. Gen. 352, 354. The letter further made reference to the Senate rule not to attach permanent legislation to continuing appropriations resolutions. Id. at 354.
 
 
 215
 The Comptroller General, however, declined to give weight to what he considered post-enactment legislative history, particularly when it appeared to him to conflict with earlier statements by the Senator. Thus, though recognizing that, as construed by the Comptroller General's earlier opinions, Section 140 extends beyond the problem Congress was presumably trying to cure, and that "it is doubtful Congress intended to deny federal judges the same comparability increases provided to other federal employees," the Comptroller General felt compelled to adhere to his earlier position. Id. at 357.
 
 
 216
 With regard to the case before us, the Government reads Section 140 the same way as the Comptroller General, and adopts the same interpretive arguments in support of construing the provision as permanent legislation. Not surprisingly, the Government relies upon and cites with favor the Comptroller General's opinions in the matter. Further, the Government agrees with the Comptroller General regarding the usefulness of Senator Dole's later statements contained in his letter, arguing that they should be disregarded since they tell a court nothing about the intent that other legislators may have had in 1981. Legislative history, says the Government, does not include later attempts at explanations regarding which other legislators have no opportunity to consider and vote on. (But see Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1374-75 (Fed. Cir. 1999) (en banc), for a contrary position by the Government in which it successfully argued that the congressional record involving a 1988 act should be used to explain the meaning of a statute enacted a year earlier.)
 
 
 217
 The Government further notes that Congress has over the years since the enactment of Section 140 referred to that section when it passed legislation specifically authorizing COLAs for judges. The Government, citing to Public Citizen, Inc. v. FAA, 988 F.2d 186 (D.C. Cir. 1993), argues that by this periodic "reenactment" of Section 140, Congress is presumed to have adopted the administrative application of the statute, in this case the opinions of the Comptroller General. Finally, the Government reiterates the point made by the Comptroller General, that Section 140 would appear to have no purpose if it did not have effect after September 30, 1982, since the next scheduled COLA would not take effect until the following day, October 1, 1982.
 
 
 218
 The plaintiff judges respond by arguing that the Comptroller General's opinions are not persuasive, particularly since they are internally inconsistent-this a reference to the Comptroller General's acknowledgment in Federal Judges IV that it is doubtful Congress intended the result called for by treating Section 140 as having continuing vitality. Plaintiffs argue that the fact that Congress from time to time passed legislation referencing Section 140 is of no consequence, as it merely reflects the fact that the Comptroller General has advised that it must. Plaintiffs further note that Section 140 is not wholly without purpose even if it is understood to expire along with the rest of the appropriations resolution: there was nothing to preclude Congress from enacting further legislation regarding federal employee salaries between December 30, 1981, and September 30, 1982, the life of the joint resolution. Had Congress done so, Section 140 would have applied to such further legislation.
 
 
 219
 I conclude that plaintiffs have the better of this argument. I begin with the established proposition, amply supported in the Comptroller General's Principles manual, that provisions contained in an appropriations act are intended to apply during the term of that act, and not thereafter. This is a presumption not easily rebutted, as it reflects a salutary canon of legislative interpretation upon which members of Congress may rely, and is supported by affirmative rules of both Houses. Absent strong if not compelling evidence otherwise, legislators should not be held to have acquiesced in the enactment of new permanent legislation that they have no reason to anticipate or opportunity in which to participate.
 
 
 220
 If this is true for legislation generally, can it be less true when the legislation at issue affirmatively discriminates against one of the three co-equal branches of government? Furthermore, as noted by the Comptroller General in his 1982 opinion, Federal Judges I, construing this legislation as permanent has the effect of impliedly repealing portions of the 1975 Adjustment Act, which otherwise applies equally to employees of all three branches. As the Comptroller General himself points out, such implied repeals are disfavored, particularly when contained in appropriations acts. Federal Judges I, 62 Comp. Gen. at 57 (citing Will).
 
 
 221
 Furthermore, as the Comptroller General, and of necessity, the Government, recognized, the language of Section 140 is at best conflicting regarding whether it was intended as permanent legislation. The presumption that a provision in an appropriations act is not permanent may be overcome when the provision contains words of futurity indicating that Congress intended it to be permanent. See Federal Judges I, 56 Comp. Gen. at 62; Principles at 2-29. According to the guidelines set forth in Principles, the word "hereafter" is the most common word of futurity, but when used, as it is in Section 140, only in an exception clause ("except as may be specifically authorized by Act of Congress hereafter enacted"), it may not be sufficient to indicate permanency. Principles at 2-29. Furthermore, the words "or by any other Act" in Section 140 ("none of the funds appropriated by this joint resolution or by any other Act") are not words of futurity; they merely refer to any other appropriations act for the same fiscal year. Id. at 2-30. Similarly, the words "[n]otwithstanding any other provision of law," also present in Section 140, are not words of futurity. Id.
 
 
 222
 Under such circumstances, and in the absence of strong evidence to the contrary, the presumption against permanency is not rebutted. The statements by one senator, even if that senator was the sponsor (although it now seems he was not really the sponsor), whether made before, during, or after the legislative session, are of little value in determining what the entire Congress may have intended. Nor can I attach much significance to the fact that Congress in later years included references to Section 140 in appropriations acts when it wished to make clear that judges were included in particular COLA legislation. In face of the consistent and repeated advice of the Comptroller General's office, the drafters of the appropriations bills hardly could have done otherwise.
 
 
 223
 The Government, echoing the Comptroller General, places great stress on the idea that Section 140 would have no legal significance if it expired along with the rest of the appropriations resolution. That is simply a misreading of the law. It is true that the next regularly scheduled COLA for government employees, if there were to be one, would normally take effect at the beginning of the next fiscal year, October 1, 1982. However, it is also true that Congress could have decided to grant a catch-up COLA before then, anytime between the effective date of the resolution and its expiration date. As the plaintiffs note, had Congress chosen to do that, Section 140 would have applied to such a grant. Thus it is not correct to construe the situation as one in which the Section 140 provision would be entirely without meaning unless it is treated as permanent legislation. The question to be asked is, could the provision apply to COLAs that might have been enacted before October 1, as well as to those that may have been enacted thereafter. The answer is yes, and thus the provision cannot be said to have no possible purpose if held to expire at the end of the fiscal year.
 
 
 224
 On balance, and taking into consideration all of the facts set out in the record, I conclude that the presumption against treating Section 140 as permanent legislation is not rebutted sufficiently to impose that result on either the Congress or the courts. As a matter of law, Section 140 expired on September 30, 1982, when the appropriations resolution of which it was a part expired.
 
 
 225
 Plaintiffs have raised a further argument against treating Section 140 as having continuing viability: the enactment of the 1989 Ethics Reform Act impliedly repealed Section 140, since that section would be inconsistent with the automatic feature of the 1989 Act. And even if the 1989 Act did not repeal outright Section 140, at a minimum it serves to provide a continuing compliance with that provision's requirements. There is support in the legislative history of the 1989 Act for the plaintiffs' position. See 135 Cong. Rec. H29,498 (1989) (statement of Rep. Kastenmeier). And the majority opinion seems impressed with it.
 
 
 226
 In 1996, in response to an inquiry from Judge Barefoot Sanders, the then-chair of the Judicial Conference Committee on the Judicial Branch, the Comptroller General opined that Section 140 was not repealed by implication by the 1989 Ethics Reform Act. See Federal Judges V, 1996 WL 97482 (Comp. Gen. Mar. 6, 1996). The Government, in its brief to this court, agrees with the Comptroller General, and further argues that, since Congress has specifically referred to Section 140 from time to time in its COLA appropriations, the 1989 Act should not be read as a blanket waiver absent specific words to that effect.
 
 
 227
 This additional set of issues, raised by the enactment of the 1989 Ethics Reform Act and its different approach to compensation for senior officials, further illustrates why a court should be reluctant to give indefinite life to Section 140, a spur-of-the-moment provision which received no consideration by the committees of Congress which would normally address such issues. Given my view that Section 140 does not have continuing vitality, I need not address these issues further.
 
 CONCLUSION
 
 228
 Because (1) the district court had jurisdiction to hear these cases under the Little Tucker Act, and therefore this court has appellate jurisdiction; (2) the Supreme Court did not create a constitutional barrier to Congress's purpose in committing itself to COLAs under the 1989 Act; (3) the district court was correct in holding that the later arbitrary denials of the COLAs were unconstitutional diminutions in compensation; and (4) Section 140 does not stand as a bar to the judges' suit, the judgment of the District Court should be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Legislative "purpose" as I. use it here is not what sometimes is presented as judicial discovery of an unspoken singular purpose behind a piece of legislation, and used as a hook on which to base an interpretation at odds with the language of the statute. It is used here in the sense of recognizing a fully documented political compromise among legislators that produced the statute in the form in which it was enacted.
 
 
 [2]
 "The Judges . . . shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." Art. III, §§ 1 (odd capitalization in original).
 
 
 [3]
 "MR. GELLER [Acting Solicitor General]: And our position is, as you correctly stated, Justice White, that the correct test, the test that this Court, I. think, set forth in O'Malley against Woodrough, is whether the statute is meant to discriminate against Article III. judges or to undermine their independence. QUESTION: And you say that if it is not, the Act is constitutional? MR. GELLER: Does not violate the Compensation Clause . . . ." Transcript of oral argument, Oct. 14, 1980, 1980 U.S. TRANS LEXIS 52, at *36.
 
 
 [4]
 I. am fully sensitive to the general principle that in interpreting statutes judges properly begin, and in most cases end, with the language of the statute, not the language of the individuals who voted for or against the statute. As my record reflects, I. am a proponent of that rule. See, e.g., VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579- 80 (Fed. Cir. 1990); see also Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1381- 82 (Fed. Cir. 1999) (en banc) (Plager, J., dissenting). This case is one of those that proves the validity of the rule by allowing the exception.
 
 
 [5]
 Pub. L. No. 90- 206, Title II, §§ 225, 81 Stat. 613, 642- 45 (1967) (codified as amended at 2 U.S.C. §§§§ 351- 61).
 
 
 [6]
 119 Cong. Rec. S19, 418 (1973) (statement by Senator McGee when introducing legislation that led to the 1975 Adjustment Act).
 
 
 [7]
 Pub. L. No. 99- 190, §§ 135, 99 Stat. 1185, 1322- 23 (1985).
 
 
 [8]
 These figures do not include a number of other positions whose salary levels are affected by Commission recommendations. See 1989 Quadrennial Commission Report at 9.
 
 
 [9]
 Pub. L. No. 91- 656, 84 Stat. 1946.
 
 
 [10]
 1989 Quadrennial Commission Report at 34 (App. A).
 
 
 [11]
 Pub. L. No. 94- 82, Title II, 89 Stat. 419, 419- 23 (1975).
 
 
 [12]
 S. Rep. No. 94- 333 (1975).
 
 
 [13]
 Section 202 provided similar adjustment formulas for the Executive Schedule pay rates; section 203 for the Vice- President; section 204 for members of Congress, the Comptroller General, and certain other legislative branch officials.
 
 
 [14]
 Section 205(a)(1) provided that:
 Chapter 21 of title 28, United States Code, relating to general provisions applicable to courts and judges, is amended by adding at the end thereof the following new section: §§ 461. Adjustments in certain salaries Effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5305 of title 5 in the rates of pay under the General Schedule (except as provided in subsection (b)), each salary rate which is subject to adjustment under this section shall be adjusted by an amount, rounded to the nearest multiple of $100 (or if midway between multiples of $100, to the next higher multiple of $100) equal to the percentage of such salary rate which corresponds to the overall average percentage (as set forth in the report transmitted to the Congress under such section 5305) of the adjustments in the rates of pay under such Schedule.
 
 
 [15]
 E.g., Congressman Hays: "Everybody wants to give the judges a raise. I. do not hear anybody saying they should not have a raise . . . ." Id. at H25,835.
 
 
 [16]
 Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101- 509, §§ 529, 104 Stat. 1389, 1427 (codified at 5 U.S.C. §§ 5303).
 
 
 [17]
 5 U.S.C. §§ 5308 provides that General Schedule employees may not be paid at a rate in excess of the basic rate for Level V. of the Executive Schedule.
 
 
 [18]
 Report of the Bipartisan Task Force on Ethics on H.R. 3660, Government Ethics Reform Act of 1989, 101st Cong. (1989), 135 Cong. Rec. H9256.
 
 
 [19]
 During this period the inadequacies in government salaries were the subject of other studies as well. See, e.g., National Commission on the Public Service (Volcker Commission), Leadership for America: Rebuilding the Public Service (1989), in House Comm. on Post Office and Civil Service, 101st Cong., Report and Recommendations of the National Commission on the Public Service (Comm. Print 1989).
 
 
 [20]
 The difference in indices did not remain in effect. In 1990, as part of the revisions to the 1970 Comparability Act, Congress applied, effective in 1991, the same index (ECI) to the General Schedule employees as was applied to the senior officers under the 1989 Ethics Act. 5 U.S.C. §§ 5303.
 
 
 [21]
 E.g., Congressman Johnson, who opposed the bill, noted that "I am not sure that the pay and ethics issues should be philosophically linked but, as a practical matter, they are linked," 135 Cong. Rec. H29,502 (1989); Congressman Crane complained that the packaging of the bill was a less than candid effort to get a pay raise through under the guise of ethics reform, 135 Cong. Rec. H29,499 (1989).
 
 
 [22]
 The majority attacks this proposition on the ground that a statute reflecting a political bargain cannot override a constitutional principle. See maj. op. at 34. That of course misses the point, since there is no constitutional principle to override.
 
 
 [23]
 The Supreme Court has granted certiorari in Hatter VIII. United States v. Hatter, 121 S.Ct. 338 (2000) (No. 99- 1978). In its petition for certiorari, the Government raised two questions: (1) whether Evans v. Gore, 253 U.S. 245 (1920), which this court treated as good law, remains such; and (2) whether general salary increases cancel a prior unconstitutional diminution. With regard to this court's application of the continuing claim doctrine, the issue here, the Government expressly declined to present the issue to the Court as a separate question for review. Pet. for Writ of Cert. at 29 n.27, United States v. Hatter (No. 99- 1978). Hatter VIII. remains controlling law on that issue.
 
 
 [24]
 The Judicial Conference of the United States is the statutorily created body of federal judges that establishes policy for the administration of the Judicial Branch. See 28 U.S.C. §§ 331.